# CONNECTICUT MUTUAL LIFE INSURANCE COMPANY v. HILLMON.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 94. Argued November 13, 14, 1902.—Decided January 2, 1903.

Where two cases, brought by the same plaintiff, against different defendants, consolidated for trial, each of the defendants is entitled to three peremptory challenges. But the weight of authority is that the right of the plaintiff is not correspondingly multiplied, and that she is entitled to but three. But if the defendants do not exhaust their right to peremptory challenges, they cannot complain that the plaintiff was allowed more than the number to which she was was entitled.

If a witness upon cross-examination is interrogated with regard to an affidavit made by him in direct conflict with his testimony, and the affidavit be subsequently put in evidence by the opposite party without limitation as to its purpose in so doing, it becomes a part of its evidence in the case, and its adversary is entitled to an instruction that such affidavit may be considered as independent evidence to be weighed in connection with the deposition of the witness, and not merely as impeaching his creditability.

Where the defendant in an insurance case relies upon a conspiracy to substitute the dead body of another for that of the insured, and prima facie evidence to that effect had been produced, it is error to exclude evidence of declarations made by the alleged conspirators to third parties, tending to show the plans of the conspirators.

THIS was an action begun July 13, 1880, by Sallie E. Hillmon, in the Circuit Court of the United States for the District of Kansas, to recover the amount of a policy of insurance, ($5000,) issued by the company March 4, 1879, upon the life of John W. Hillmon, her husband, in which the plaintiff was named as beneficiary. Plaintiff made the usual allegations of compliance with the terms of the policy, and averred that the assured had died March 17, 1879, thirteen days after the policy was issued, and that due proofs had been forwarded to the company. Other actions were also brought against the New York Life Insurance Company and the Mutual Life Insurance Company of New York, upon policies of insurance issued by them

upon the same life, which actions were subsequently compromised.

Defendant interposed a general denial, and for a special defence set up in substance that on or before November 30, 1878, John W. Hillmon, John H. Brown, Levi Baldwin and diverse other persons to defendant unknown, fraudulently conspiring to cheat and defraud defendant, procured a large amount of insurance on the life of Hillmon, to wit: $10,000 in the New York Life, by policy dated November 30, 1878; $10,000 in the Mutual Life, by policy dated December 10, 1878; and $5000 in the Connecticut Mutual Life, by the policy in suit, dated March 4, 1879; that thereafter, in pursuance of such conspiracy, Hillmon, Brown and Baldwin falsely represented to defendant and others that said Hillmon had died, and that a certain dead body which they had procured was that of Hillmon, whereas in truth Hillmon " was not and is not dead," but has kept himself concealed under assumed names for the purpose of consummating the conspiracy.

As a third defence the company set up a release by plaintiff of all her claims against it under the policies.

Actions having been begun upon all three of these policies, an order was entered July 14, 1882, consolidating them for trial. Two trials of the three consolidated cases resulted in disagreements of the jury. On February 29, 1888, judgments in each were rendered for the plaintiff, which, upon writs of error, were reversed by this court and the cases remanded for a new trial. 145 U. S. 285. The material facts of the case are fully set forth in that report, and will not be here repeated, except so far as they are pertinent to the questions before this court for consideration. After two more trials of the consolidated cases, which resulted in disagreements of the jury, a compromise was effected between the plaintiff and the New York Life, which was followed by dismissal of the action against that company. Thereafter, and on January 9, 1895, an order previously entered consolidating the two remaining actions for trial was continued in force against the objection of each defendant, and the consolidated cases again came on for trial, resulting in separate judgments November 18, 1899, against both companies. To reverse

this defendant sued out a writ of error from the Circuit Court
of Appeals, and upon hearing in that court the judgment was
affirmed with one dissent. 107 Fed. Rep. 834. The Mutual
Life sued out a similar writ of error, but compromised the case
before it was heard in the Circuit Court of Appeals.

*Mr. William G. Beale* for petitioner. *Mr. Buell McKeever,
Mr. Gilbert E. Porter* and *Mr. James W. Green* were with him
on the brief.

*Mr. Lysander B. Wheat* for respondent. *Mr. C. F. Hutch-
ings* and *Mr. John H. Atwood* were with him on the brief.

MR. JUSTICE BROWN, after making the foregoing statement,
delivered the opinion of the court.

We shall have occasion to notice but few of the 108 assign-
ments of errors in this case.

1. Several of these relate to an order of consolidation, and
to the ruling of the court giving to the plaintiff six peremptory
challenges to the jury, while each defendant had but three.

On June 14, 1882, the three original cases were first consoli-
dated for trial, and so remained through all the trials which
took place prior to the settlement with the New York Life.
The propriety of this consolidation was affirmed by this court
upon its first appearance here in 145 U. S. 285. A stipulation
appears to have been entered into October 16, 1899, between
the attorneys for the plaintiff and the attorneys for the three
defendants, to set aside the order of consolidation, and a motion
was made for an order to that effect, which was overruled, and
the order of consolidation was continued in force as to the two
remaining defendants. It would seem that the court refused
to be controlled by the stipulation. We see no reason to doubt
the propriety of this order, nor does it appear to have been se-
riously contested. But its effect upon the number of peremp-
tory challenges to which the defendant was entitled is made
the subject of dispute. Upon the former hearing of this case
it was held that the consolidation of the three cases there con-

sidered did not impair the right of each of the three defendants to three peremptory challenges under Rev. Stat. sec. 819. But the question was left undecided whether the right of the plaintiff was multiplied, so that she became entitled on the last trial to six peremptory challenges, or only to three.

The Circuit Court was of opinion that, as under our ruling, the two defendants were under Rev. Stat. sec. 819, each entitled to three peremptory challenges, or six in the aggregate, the plaintiff was also entitled to six. This is the converse of the proposition established by this court when the case was first here. The argument of the defendent in this connection is that under the ruling of the court each defendant was treated as one party and the plaintiff as two parties; that it gave the plaintiff more challenges than she would have had in one case, treating the causes of action as distinct, and the plaintiff entitled to her three challenges in each case, with the result that each defendant, without its consent, and against its protest, was compelled to try its own cause before a jury to which it was given only one half as many peremptory challenges as were given to the plaintiff. The consequence was that each defendant was prejudiced by the fact that every additional peremptory challenge allowed to the plaintiff beyond three makes arbitrarily a vacancy which may be filled in spite of the defendant by a juror, whom it might and would have challenged if it had an opportunity to do so. The substance of the argument is that, it having been held upon the former hearing here, that each defendant lost no right by the consolidation, and was entitled to as many challenges as if no such consolidation had taken place, the plaintiff was not entitled to any more challenges than she would have been entitled to, in case the consolidation had not taken place. Quite a number of cases are cited in support of this proposition: *Savage* v. *State*, 18 Florida, 909; *Wiggins* v. *State*, 1 Lea, (10 Tennessee) 738; *Mahan* v. *State*, 10 Ohio, 234; *State* v. *Earle*, 24 La. Ann. 38; *Shoeffler* v. *State*, 3 Wisconsin, 823; Thompson on Trials, sec. 45; Proffatt on Jury Trials, sec. 164. The case of *Spies* v. *The People*, 122 Illinois, 1, is to the contrary.

Conceding that the great weight of authority supports the

proposition of the defendant, we are still of opinion that it is not entitled to take advantage of it, inasmuch as it made but two peremptory challenges, waiving its right to a third, and thereby acquiesced in the composition of the jury. The only effect of allowing the plaintiff six peremptory challenges was to put three additional men upon the jury, whom the defendant could not challenge, and if it had exhausted its peremptory challenges it might perhaps claim to have been prejudiced by the fact that three men had been put upon the jury which it was not entitled to challenge; but having failed to exhaust its peremptory challenges, it stands in no position to complain that it was deprived of the right to challenge others. *Stout* v. *Hyatt*, 13 Kansas, 232, 241; *Atchison &c. R. R. Co.* v. *Franklin*, 23 Kansas, 74; *Florence &c. Railroad Company* v. *Ward*, 29 Kansas, 354; *Atlas Mining Co.* v. *Johnston*, 23 Michigan, 36; *Grand Rapids Booming Co.* v. *Jarvis*, 30 Michigan, 308.

2. Error is charged in the refusal to instruct the jury that "the statement signed and sworn to by John H. Brown on the 4th day of September, 1879, having been introduced in evidence by the plaintiff, may be considered in connection with the deposition of John H. Brown as evidence of the facts stated under oath, against the plaintiff, with like effect as the deposition of John H. Brown, and may also be considered as affecting the credibility of said Brown as a witness."

In lieu thereof the court charged the jury that Brown's statement, signed and sworn to by him, was not affirmative evidence of the truth of any matter therein contained or mentioned, and that it should not be considered by the jury except as affecting the credibility of the evidence of Brown in his deposition. To determine the correctness of this construction it is necessary to consider the circumstances under which the evidence was produced. The alleged death of Hillmon was said to have occurred in March, 1879. Upon the trial plaintiff offered and read in evidence the deposition of John H. Brown, taken on December 30, 1881, who swore generally that he was employed by Hillmon driving a team, and afterwards in taking care of and feeding hogs; that he started with him from Lawrence for Wichita for the purpose of locating a cattle ranch, and that

Hillmon was accidentally killed by the discharge of a gun in the hands of Brown. To contradict this testimony William J. Buchan, a witness put upon the stand by the defendants, swore that in the spring or summer of 1879, but a few months after the alleged death, he met Brown by appointment at Lexington, and was told by him that he was uneasy about the affair; that it was not Hillmon who was killed but another man, but that Hillmon had got away and they were hunting for him; that he wanted to get out of it himself and .to turn State's evidence, and that he wanted witness to see the attorney for the insurance company and let up on hunting for him if he would go on the stand and tell the truth about the whole affair.    Upon the cross-examination of Buchan the *plaintiff* offered in evidence an affidavit made by Brown on September 4, 1879, in which he repeated the substance of the conversation testified to by Buchan, and stated that instead of Hillmon being killed it was another man whom Hillmon shot.    This affidavit had already been produced, though not formally put in evidence by the *defendant* on the cross-examination of Brown.    It was under these circumstances that the court ruled that the affidavit was not affirmative evidence of any truth or matter contained in it, and should not be considered, except as affecting the credibility of the evidence of Brown given in his deposition.

It is insisted in behalf of the plaintiff that, as no exception was taken to this part of the charge, its propriety cannot be questioned at this time; but as an exception was properly taken to the refusal of the court to charge that the statement having been introduced in evidence by the plaintiff may be considered in connection with Brown's deposition, as evidence of the facts therein stated under oath with like effect as his deposition, we think there was sufficient to raise the point that the affidavit was not to be treated merely as affecting Brown's credibility, but as substantial evidence in favor of the plaintiff.    Having excepted to the refusal to give a certain instruction, it was not necessary to repeat such exception when the contrary of such request was given in the general charge.    As defendant had raised the point in one form, it was not necessary to repeat it in another.

As this statement of Brown's had already been produced by the defendant upon the cross-examination of Brown, to impeach his credibility as a witness, and he had been cross-examined as to its contents, it is difficult to see why it was introduced by the plaintiff in connection with the cross-examination of Buchan. It was evidently put in for some purpose, and it is difficult to assign any other than to make it a piece of independent testimony, since, in view of Brown's deposition to the contrary, the plaintiff might still have argued that the statement or affidavit, if ever made, was false. As now claimed, it was in-introduced for the purpose of explaining why the plaintiff consented to release her claim against the insurance company, though it seems to have been quite unnecessary in this connection, since its statements were already in evidence as part of Brown's cross-examination. Conceding that as a piece of independent testimony, a mere affidavit was not admissible, it was competent for the defendant to waive this objection and to treat it as other testimony in the case offered by the plaintiff. Under such circumstances it is something more than an admission by the witness that he had made statements inconsistent with his testimony upon the subject. For whatever purpose it was introduced, and in view of the fact that it was offered generally and without limitation as to its purpose, it became a piece of plaintiff's evidence to be weighed and considered like any other testimony in the case. We do not undertake to say that the plaintiff was absolutely bound by it and estopped to deny its truth, in view of Brown's deposition to the contrary, but we think it was giving it too little effect to charge the jury that it could only be considered as impeaching the credibility of Brown; and we do not think defendant was asking too much in instruction number 44, that it might be considered in connection with the deposition of Brown as evidence of the facts therein stated under oath, against the plaintiff, with like effect as the deposition. 1 Greenl. Ev. sec. 442. The words " with like effect " were evidently intended to instruct the jury that the deposition and the affidavit were each independent of the other and each affirmative testimony—not, however, that they were of equal weight.

Suppose, for example, the only evidence of the identity of the body found had been the testimony of Brown. It doubtless would have been correct to charge that the utmost effect of his affidavit, if it had been formally introduced upon cross-examination, would be to destroy his testimony as given in the deposition. His credit as a witness being thus destroyed, the fact of Hillmon's death would be regarded as not proven, and the plaintiff would be considered as having failed to establish her case. But upon the other hand, as the affidavit had not been put in upon the cross-examination of Brown, and the plaintiff read it as part of her case, it must necessarily be considered as a piece of independent evidence to be weighed in connection with the deposition, and the jury was necessarily left to consider which of the two, when taken in connection with the other testimony in the case, was to be considered as the more credible. The general rule undoubtedly is that, when a party offers a witness, he thereby generally represents him as worthy of belief, and while under the peculiar circumstances of the case this rule would not apply any more to the affidavit than to the deposition, the plaintiff, by putting both in evidence, without restriction as to the purpose of so doing, places them on the same level, and cannot be heard to say that the affidavit may not be considered as testimony of the facts therein sworn to as well as the deposition.

3. Several assignments are based upon the exclusion of the testimony of the witnesses Phillips, Blythe, Crew and Carr, as to acts performed and declarations made by the alleged co-conspirators John W. Hillmon, John H. Brown and Levi Baldwin, after evidence had been introduced establishing such conspiracy. That considerable evidence of a conspiracy between these three parties had been introduced and at a very considerable length is not denied, and the main objection to the introduction of the acts and declarations of the above witnesses was based upon the ground that the plaintiff, the wife of Hillmon, was not alleged to have been a party to such conspiracy.

The proposed testimony of Phillips, who was a physician, and had been called professionally by Baldwin to his house in the summer or fall of 1878, related to certain inquiries made

by Baldwin as to the effect of death upon bodies. In this connection defendant offered to prove that Baldwin asked the witness if he had any insurance upon his life, and said he had been thinking about taking out some himself, and in the same conversation asked Phillips how long a dead body would decompose after it was buried. He further asked if it " would not be a good scheme to get a good insurance on your life and go down South and get the body of some Greaser and pawn it off as your body and get the money."

The witness Blythe, a lawyer and fire insurance agent, an acquaintance of John W. Hillmon and Levi Baldwin, testified that they had called at his office in the autumn of 1878, asked him concerning life insurance, how to get it, what were good companies, how they should make application, whether a person could travel in different countries without forfeiting the insurance, what proceedings were necessary to collect insurance upon death, what length of time would be required, etc., and that a week or ten days before this conversation he had met Baldwin alone on the street. Defendant thereupon asked what was said by Baldwin at that time, and offered to prove that Baldwin asked the witness if he knew anything about life insurance and about the companies ; and that a friend, a relative or connection, wanted to get some insurance, and he wanted to know if witness could recommend some good company to him. Whereupon witness told him how to do it.

By the witness Crew the defendant offered to prove the following testimony, all of which was excluded by the court, namely, that witness resided in the spring of 1879 in Lawrence, Kansas ; was acquainted with both Mrs. Hillmon and Baldwin, and that as receiver of a local bank he had several notes of Baldwin's for collection, all of which were overdue. Two of the notes were secured by mortgage on real estate and one by chattel mortgage ; that he had talked of foreclosing the mortgages, as he had been unable to collect either principal or interest ; that Baldwin told him a part of the money represented by his indebtedness had been furnished to insure the life of John W. Hillmon ; that in the latter part of March of that year (the conversation having taken place a few days before the first of

March) he had heard of Hillmon's death ; that at this time he had a conversation with Baldwin regarding the latter's indebtedness to the bank, in which Baldwin told him to let his matters rest, as he was then on his way West after the body of Hillmon ; that he had arranged for a portion of the insurance on the life of Hillmon, and that as soon as he got it he would be able to straighten up all his affairs; that Baldwin stated that he was to have $10,000 of this insurance ; that witness had acquainted himself thoroughly with Baldwin's financial condition and found him in very straitened circumstances, having some property but all mortgaged, and mostly all mortgaged twice, and that his indebtedness was pressing him severely.

The witness Alexander Carr testified that he knew both Baldwin and Hillmon, and that in March, 1879, he and Baldwin were out together buying stock some time after the 10th of March. The witness was then asked what conversation he had with Baldwin in regard to any business transaction between him and Hillmon, and offered to prove that witness was talking one day to Baldwin about himself and Carr going into a sheep ranch together ; " and one day he was speaking about that he was under ' brogue' with John W. Hillmon, and he said he and Hillmon had a scheme under 'brogue,' and he said that if that worked out all right he was all right."

All this testimony was ruled out apparently upon the ground that declarations made by Baldwin were not admissible against the other conspirators to prove the existence of the conspiracy if not made in their presence ; that these declarations were mere admissions or narrations of what had already taken place and were not made in furtherance of a common design, while it was under way or in process of execution so as to form a part of the *res gestæ ;* and for the further reason that the testimony was not admissible against the plaintiff, who was not alleged by the insurance company to have ever become a party to the alleged combination to defraud the insurance company, either by an original participation in the scheme or by subsequently adopting it.

While we are not called upon to express an opinion upon the question whether the mere proof of a conspiracy to defraud the

defendant by the procurement of an insurance upon Hillmon's life with the view of ultimately collecting the amount of the policies by a false pretense of his death would be sufficient to avoid the policies as having been obtained by fraud, without proof that such conspiracy had been consummated by compassing the death of another party and passing off the body of the deceased as that of Hillmon, the fact still remains that there was evidence of a conspiracy to procure a large amount of insurance upon the life of Hillmon and to procure in some way the body of another man to pass off as that of Hillmon, and thereby to obtain the amount of these policies, nominally, at least, for the benefit of Hillmon's wife. It is true the plaintiff is not alleged to have been a party to such conspiracy, although she was named as beneficiary in the policies, but her husband is alleged to have been a party, and any fraud perpetrated by him at the time the policies were taken out was available as a defence by the company in an action by her.

These questions and declarations of Baldwin to the four witnesses above stated were made either just before or just after the policy was taken out. They were not so much narratives of what had taken place as of the purpose Baldwin had in view, and we know of no substantial reason why they do not fall within the general rule stated by Greenleaf, 1 Greenleaf on Ev. sec. 111, that every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them. The conspiracy then existed and was still pending. *Smith* v. *National Benefit Soc'y*, 123 N. Y. 85.

These declarations taken together tend to show that Baldwin, who seems to have taken the most active part in the transactions connected with this policy, was heavily indebted, and being pressed by his creditors; that he expected in some way to obtain a large part of Hillmon's insurance, and that he was also desirous of going into a sheep ranch with Hillmon, with whom he declared he had a scheme under consideration by which they could raise the necessary funds; that such scheme consisted in

obtaining insurance upon Hillmon's life, and then going South and getting the body of some other person and passing it off as the body of the insured, and thus recovering the amount of the policy. This testimony was certainly corroborative of other testimony in the case, which both courts below agreed as establishing *prima facie* evidence of a conspiracy, and which was to the effect that Baldwin and Hillmon had been intimate acquaintances for eight or ten years prior to 1879; that Baldwin, who appears to have been a man of considerable means, had employed Hillmon in various capacities connected with his farm, and that during his visits at Lawrence Hillmon generally stayed at his house. Hillmon there first met his wife, who was a cousin of Baldwin's and worked at his house. Hillmon was a man of no property, and after his marriage he and his wife occupied a single room in the house of one Mary Judson, and did their cooking upon her stove. Baldwin and Hillmon became interested in life insurance, and consulted various agents as to their companies and about methods of collection in case of loss. In a conversation with one Wiseman in February, 1879, Hillmon stated that he was going West on business and might get killed; asked about proofs of death; what the widow must do to get her insurance money and what evidence she would have to furnish if he were killed. Under these circumstances he took out insurance for $25,000, the annual premium for which amounted to $600. There were various other items of testimony of the same character, which the courts below regarded as sufficient *prima facie* evidence of a conspiracy.

Under the circumstances we think the evidence of the four witnesses in question should have been submitted to the jury, and that such testimony was admissible as against the plaintiff, though she was not alleged to be a party to the conspiracy, upon the theory that any fraudulent conduct on the part of the insured in procuring the policy, or in procuring the dead body of another to impersonate himself, was binding upon her. It is well settled that the fraud of the insurer's agent in the procurement of the policy is binding upon the principal. *Millville &c. Ins. Co.* v. *Collerd*, 38 N. J. Law, 480; *Nat. Life Ins. Co.* v. *Minch*, 53 N. Y. 144; *Oliver* v. *Mut. &c. Ins. Co.*, 2 Curt. 277; *Burruss* v. *Nat. Life Ass'n*, 32 S. E. Rep. 49.

A number of other alleged errors are embraced in the assignments, but we see none to which we find it desirable to call attention. For the error in the instruction regarding Brown's affidavit and in ruling out the declarations of the four witnesses named,

> *The judgment of the Court of Appeals is reversed and the case remanded to the Circuit Court for the District of Kansas with instructions to grant a new trial.*

MR. JUSTICE BREWER and MR. JUSTICE WHITE dissented.