**VAN RIPER et al. v. UNITED STATES, and four other cases.**

(Circuit Court of Appeals, Second Circuit. July 27, 1926.)

Nos. 401–403, 405, 406.

**1. Conspiracy ⬡32.**

Scheme to defraud, when shared among several, becomes a conspiracy.

**2. Conspiracy ⬡43(12)—Post office ⬡48(8).**

Prosecution under Criminal Code, § 215 (Comp. St. § 10385), for mailing letters pursuant to joint scheme to defraud and for conspiracy, *held* not to involve separate schemes to defraud, because of continuance of same scheme by different defendants.

**3. Conspiracy ⬡32—Post office ⬡35.**

That defendants, charged under Criminal Code, § 215 (Comp. St. § 10385), with mailing letters pursuant to joint scheme to defraud and with conspiracy, had no belief that stocks had the value ascribed to them by letters, was sufficient to constitute offense.

**4. Conspiracy ⬡47—Post office ⬡49.**

Evidence, in prosecution under Criminal Code, § 215 (Comp. St. § 10385), for mailing letters pursuant to joint scheme to defraud and for conspiracy, *held* sufficient as to each defendant as to some counts.

**5. Criminal law ⬡925½(4).**

If newspapers seen by jury affected verdict, matter *held* one of discretion for trial judge.

**6. Criminal law ⬡422(1).**

When men enter into agreement for unlawful end, they became ad hoc agents for one another, and declarations or acts, done pursuant to common purpose, are competent against all.

**7. Criminal law ⬡59(1).**

Person joining an existing group engaged in commission of joint crimes assumes responsibility for all done theretofore.

**8. Criminal law ⬡423(8).**

In prosecution against several defendants for violation of Criminal Code, § 215 (Comp. St. § 10385), by mailing letters pursuant to joint scheme to defraud and for conspiracy, evidence of things done before certain defendants came into conspiracy *held* admissible.

**9. Criminal law ⬡673(4)—Instruction that defendants not bound by acts and declarations of others after they withdrew from conspiracy held sufficient, without formal rulings on motions to strike out (Criminal Code, § 215 [Comp. St. § 10385]).**

In prosecution, under Criminal Code, § 215 (Comp. St. § 10385), for mailing letters pursuant to joint scheme to defraud and for conspiracy, instruction that defendants who had withdrawn were not bound by subsequent acts and declarations of those who remained *held* sufficient, without formal rulings on motions to strike out evidence.

**10. Criminal law ⬡427(5).**

In prosecution, under Criminal Code, § 215 (Comp. St. § 10385), for mailing letters pursuant to joint scheme to defraud and for conspiracy, persons representing themselves as speaking from defendants' offices *held* sufficiently identified by substance of telephone conversations to render them admissible.

In Error to the District Court of the United States for the Southern District of New York.

Lewis C. Van Riper and another, Fred A. Maloney and another, Harry Hedrick, Alexander Ackerson, and William W. Sweet and another were convicted of mailing letters pursuant to joint scheme to defraud, and for conspiracy to violate Criminal Code, § 215, and they bring error. Affirmed as to some counts, and reversed as to others.

Writs of error to a judgment of conviction of the United States District Court for the Southern District of New York (Sawtelle, J., presiding), upon an indictment in ten counts. The first nine counts were for violation of section 215 of the Criminal Code (Comp. St. § 10385) in mailing ten separate letters pursuant to a joint scheme to defraud; the tenth for a conspiracy of all the defendants to violate that section. The plaintiffs in error are Lewis C. Van Riper, Charles E. Van Riper, William C. Ish, William W. Sweet, Harry Hedrick, Fred A. Maloney, Thomas J. McCluskey, and Alexander Ackerson. All were convicted upon all counts but the eighth. All were sentenced to five years and $1,000 on count 1 and to five years on counts 2, 3, 4, 5, 6, 7, and 9, and to two years on count 10; the sentences to run concurrently.

The indictment alleged a scheme to defraud in the sale of stock of the Parco Oil Company at prices exceeding its par value of 10 cents a share, fixed arbitrarily and regardless of its real or market value. Hedrick was to send through the mails a pamphlet and other writings containing false information and advice pertaining to the Parco Company, the Ertel Company, and several other companies. The defendants were falsely to report to prospective buyers that the Parco Company was selling stock to develop the property, all of which, beyond the cost of selling, should go to the treasury, that the only profits of the sellers would be a small royalty on actual production, that Hedrick had nothing to sell, and that the price of the stock would go much higher. The defendants would find out the holdings of existing shareholders, pretend that they had an offer for blocks of stock a little larger, and persuade them to fill up their holdings, so that they might fulfill the offer for the larger block.

The first seven counts laid the posting of letters on the following dates: August 16, 1924, October 15, 1924, July 15, 1924, October 23, 1924, July 19, 1924, August 29, 1924, and April 17, 1925. The eighth count, which was not proven, laid a letter of May 4, 1925; the ninth, one on April 30, 1925.

In January, 1924, the two Van Ripers and a defendant named Brown, who did not appeal, rented room 201 at 15 Moore street, New York, to conduct a business for the general sale of stock. On February 28th Hedrick, who had known the elder Van Riper for some time before, hired room 205 across the hall, where he began to publish a paper called the Financial Analyst, which promoted the sale of interests in the Great Northern Gold Mine Syndicate, and later of shares in the Ertel Company and the Parco Company. Shortly thereafter Hedrick engaged the defendants Maloney and McCluskey as salesmen and took into his room Rose Resnick, a stenographer formerly employed by Van Riper. He put in two telephones, one of which was discontinued on April 17th and the other on May 12th. In March, 1924, the defendant Sweet heard from one Woodin of an oil well which was being drilled in the state of Wyoming by a man named Kuykendall. Woodin showed him a letter from Kuykendall, saying that it would not take more than $5,000 to complete the well and improve the property, which, in Kuykendall's judgment, was sure to produce largely.

The defendant Brown had several interviews with Sweet at the latter's office, to which eventually he brought Hedrick, and the two discussed Kuykendall's proposal to dispose of his well. Eventually on May 9, 1924, Sweet and Hedrick made an agreement to furnish the money necessary to complete the drilling. An existing corporation, the Ertel Oil Company, was to have a 60 per cent. interest in the well, Sweet 10 per cent., and Hedrick and any associates of his 30 per cent. The money was to be raised through sales of stock in the Ertel Company. Hedrick, shortly before the conclusion of the contract on April 23d, in the Financial Analyst, urged the public to buy the Ertel stock, which he and the Van Ripers were then selling from their offices in Moore street.

On May 10th, the day after the contract was closed Sweet left for Wyoming to investigate the well, and saw Kuykendall, who, with Wilcox, the driller, explained to him the existing situation. Traces of oil had been found pretty steadily, but none in commercial amount, though both Kuykendall and Wilcox were sanguine that the well might produce on any shift of drilling. Sweet sent a telegram to Hedrick that Kuykendall was sure of a 500-barrel well and that he had cased off a 50-barrel well in the upper section. Kuykendall denied that he had given any prospective quantity, and both he and Wilcox that they had ever said that a producing well had been cased off. Hedrick in New York adopted these statements in an issue of the Financial Analyst, and in a few days got a letter from Sweet, repeating them and adding that the well had been driven 690 feet deep. Sweet dilated upon the prospects, told him of a contract he had made with Wilcox to dig 100 feet deeper at $25 a foot, and asked for money. On May 20th Sweet and Kuykendall made a contract by which Sweet got a three-fourths interest in Kuykendall's lease, on a payment of $5,000. Sweet advanced $500 and Hedrick $1,000 upon the contract between Wilcox and Sweet, so that the drilling continued, but no part of Kuykendall's money was ever paid.

The Parco Oil Company was incorporated on June 5th upon Sweet's return; 250,000 shares of stock were issued to Hedrick in consideration for a transfer by him to it of Sweet's interest in the lease, which Sweet had meanwhile agreed to convey to Hedrick. The directors authorized the issue of 250,000 more shares to Hedrick for the transfer of an adjacent lease, but so far as appears these were not issued. The matter is of no importance. Thereupon Hedrick began the sale of Parco's shares as treasury stock, and to make exchanges of that stock for shares in the Ertel Company. In these as in his other sales he used as salesmen Maloney and McCluskey, who had returned to him after a brief absence. L. C. Van Riper was one of the organizers of the Parco Company, and helped in the preparation of the Financial Analyst. His son was employed in his office with him, mailed out circulars, and signed receipts for money.

The defendant Brown went to Wyoming on July 10th and stayed there until the middle of September, paying Wilcox for the drilling. He constantly sent telegrams to Hedrick, which showed that no oil in commercial quantities had been obtained, but that there continued to be a showing of oil and that a 100-barrel well might be expected. The drilling stopped on the 13th of September for lack of funds. No oil was found, the well was abandoned, the lease forfeited, and the stock became valueless. On August 10th Hedrick left New York for British Columbia and visited the well en route. He arrived about August 14th and spent four or five

days there. In his absence the elder Van Riper was left in charge of the sales of stock, the editing of the Analyst, and the expenditure of the moneys which came in. Hedrick was not shown to have had any further connection with the enterprise after he left the well, but was also not shown to have abandoned it. His name continued to be used on the letters and bulletins, as before, and he left no instructions to have its use discontinued.

The defendants engaged in another venture with a man named Tingley. Shortly after his return in June, 1924, Sweet met Tingley, who claimed to have a new process for refining gasoline in accordance with his own patents, and had a plant at a place called Nitro, W. Va. Tingley showed Sweet certain tests, which he said had been made at the plant and which had resulted in great economy of production. At some of these conferences Hedrick was present. Finally, on July 29th, Tingley made a proposal to lease his property to the Parco Company, which was accepted on its behalf by Sweet, who was its president, on August 4, 1924. On the strength of this agreement Hedrick issued a copy of the Analyst, setting forth the closing of the agreement, the acquisition of leases of oil lands in West Virginia and extolling the process. On August 22d Tingley acquired rights in certain leaseholds in West Virginia, which he transferred to Hedrick, and which were in turn announced in a news bulletin on August 29th. No drilling was ever started upon this property. The rent of $500 a month provided for in the lease was never paid. Only $1,500 out of the $3,000 payment called for by the agreement, necessary to make the improvements, was ever paid. The plant never operated commercially, and never had the capacity of 3,000 gallons daily, as stated in the printed matter, though Tingley thought it might reach that capacity, if improved.

In their sales of stock it was the practice of Maloney and McCluskey to use the long-distance telephone. Frequently they urged a customer who had already bought stock to buy more, on the representation that another person either would buy, or had bought, a large block of stock at a substantial advance upon the customer's purchase price. This block was larger than the number of shares the customer already had. If he would fill up his purchases to the amount of the order, the whole block could be sold at a profit. Rose Resnick said that she heard these representations made in

Hedrick's hearing, but it was argued that, as the telephones had been taken out of Hedrick's office before the Parco Company was organized, this must have been untrue. The defendants at Moore street continued to offer stock through the month of October.

At about the end of September Sweet went to Europe and the younger Van Riper left the offices. Ish, who had been secretary, left on the last day of October, and the elder Van Riper some time early in November. This left no one in the offices, and they were closed. The defendant Ackerson had known the elder Van Riper in Moore street, and Maloney and McCluskey earlier still. Before Van Riper went to Europe, Ackerson saw Maloney and asked him to call him up at his brother's office downtown. He had a conference with him there, at which Ackerson engaged him to sell shares of stock over the telephone. Ackerson also hired McCluskey and the stenographer, Resnick, together with the defendant Rabinowitz, who later turned state's evidence, but had not been identified with the scheme up to this point. Ackerson did business first at 500 Fifth avenue under the name of James Loftus & Co., where he personally assumed the alias, Martin Sands, under which he opened and conducted the bank accounts of the supposed firm. Later he did business under the name of Craig, Matthews & Co., Holton & Abbott, and H. P. Douglas & Co. The firm of Holton & Abbott was apparently discontinued on April 10th, and Ackerson is not shown to have been connected with the subsequent activities of Maloney, or McCluskey, who continued to sell Parco and other stocks down to May, 1925.

The chief points raised upon these writs are that the defendants were tried upon two separate charges—the first, that in which all the defendants were concerned up to the end of October, 1924, which are described as the "downtown" offices; the second, that started by Ackerson in November in the "uptown" offices, Loftus & Co., Craig, Matthews & Co., Holton & Abbott, and H. P. Douglas & Co. It is argued that the first of these had terminated before the second began, and that the case was mistried for this reason; next, the defendants separately deny their connection with the scheme, or that it was in fact fraudulent; third, that various evidence was admitted against all the defendants, which was not properly limited to those connected in the conspiracy at the times which it concerned.

Joseph F. Kroppy, of New York City, for plaintiff in error Hedrick.

Alexander T. Hussey, of New York City, for plaintiffs in error Sweet and Ish.

Patrick J. Dowd, of Waltham, Mass., John P. Feeney, of Boston, Mass., and Thomas H. Mahoney, of New York City, for plaintiffs in error Maloney and McCluskey.

Andrew Foulds, Jr., of New York City, for plaintiff in error L. C. Van Riper.

Harlah E. Cecil, of New York City, for plaintiff in error C. E. Van Riper.

Alexander Ackerson, of New York City, pro se.

Guido Pantaleoni, Jr., of New York City, for the United States.

Before MANTON, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1, 2] We can see no reason to say that there were involved in this case two separate schemes to defraud. Such a scheme, when shared among several, becomes a conspiracy, so that in fact the conspiracy count adds nothing of substance to the charge, except as it relieves the prosecution of the necessity of showing the connection of all the defendants to be charged at the date of the posting of the letters laid in the indictment. The same rules which govern the trial of conspiracies are therefore applicable to such trials. Hence, if the conspiracy was continuous, the scheme to defraud was continuous. It is quite true that most of the several defendants entered and left this scheme at different times, and this, as will appear, had an effect upon the result, but it did not turn it into a series of separate schemes. We agree that mere identity of content will not make identical two schemes which have no common participants (Terry v. U. S. [C. C. A. 9], 7 F.[2d] 28), and that a scheme or conspiracy may be definitively abandoned, though some of the participants resurrect it later, because it is defined as much by the persons who engage in it as by the purposes they have in view. But in the case at bar Maloney and McCluskey sold or tried to sell Parco stock from the very beginning in June until May of 1925, when the whole business was stopped. They formed the nucleus from which the rest slipped away, and to which Ackerson and Rabinowitz, and later Brown, for a second time, adhered.

Moreover, though there was an interval in the selling of stock, there was no abandonment of the scheme, because Ackerson had already suggested to Maloney that he go into his employ before the elder Van Riper left, and under circumstances which showed that he had acquainted himself with Van Riper's plans, better than Maloney himself. In so reviving the moribund business and taking over both salesmen and Resnick the stenographer, Ackerson continued the old scheme and the organization, at least in part. At any rate the jury might have so concluded, just as they might have concluded that, in offering Parco stock after they opened the "uptown" offices, they were acting with Ackerson's knowledge and in accordance with their original understanding with him. Thus it appears to us that the learned judge was right in overruling the point.

[3, 4] The question of chief importance, however, is not that, but whether the case should have gone to the jury. The defendants have argued their position, ignoring the case of Durland v. U. S., 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709, which set down the rule, long recognized in civil deceit, that a promise which the promisor does not mean to perform, or knows that he cannot, is as good a ground for prosecution as a misrepresentation of some fact outside his mind. It was not necessary here for the prosecution to rest upon the statements made about the well at Parco or the plant at Nitro, or to show that the defendants knew them to be false. It was enough for it to prove that they had no belief that the stocks had the value which they ascribed to them, or that they were wholly sceptical as to the prospects of the well and the other property. They represented themselves as believing in these prospects, and that was a material fact likely to influence their customers. We have twice very recently discussed the question, and need do no more than refer to our own decisions. Bentel v. U. S., 13 F.(2d) 327, June 17, 1926; Knickerbocker Merchandising Co. v. U. S., 13 F. (2d) 544, July 14, 1926. The jury might therefore convict these defendants because it concluded that they were in a far better position to judge than the unsophisticated public to whom they sold, and that they had no belief in the possibility of striking oil or in the gasoline plant's becoming a valuable asset, but thought it the merest gamble. If they had no more belief than that, it did not justify their gaudy predictions of success, nor is it an excuse to protest that they might themselves have been deceived. It was for the jury to say whether or not they were, or

whether they were without any belief one way or the other.

### Maloney and McCluskey.

These defendants were connected with the business throughout, as we have already said. Whatever their ignorance while the drilling continued and the "downtown" offices remained open, they could have had no further illusion while in Ackerson's employ. The case is too plain for argument, without the evidence of the deceits by which they persuaded existing shareholders to take on new shares; i. e., "reloading them," as the phrase goes, by promises that their holdings, if completed, had already found a market.

### Lewis E. Van Riper.

Whatever may be said as to the original connection of Lewis E. Van Riper with the business, he was in active charge of the Moore street offices after Hedrick left on August 10th. He did not finally abandon it until November, and he knew, or at least he could be found to have known, that on September 13, 1924, the drilling had stopped, and that there was no further justification for holding out the promises for the future of the well which were made thereafter, as, for example, in the issue of the Analyst of October 18th. Whether or not any sales were made after that date is unimportant; that issue betrays the scheme and it is enough.

Moreover, the disposition so shown is not to be limited to the precise time of that issue. Van Riper was an officer of the Parco Company, had been closely associated with Hedrick from the outset, and it was a proper—indeed, in our opinion, an inevitable—inference that he shared with the rest whatever knowledge they had. If, as we think, the jury was justified in concluding that the scheme was a fraud at an earlier period, say from July 15th, the date of the earliest count, they were justified in supposing that Van Riper was equally in it with the rest.

### Charles E. Van Riper.

This defendant had only a slight connection with the enterprise, and it would in our judgment be appropriate to reduce his sentence. But with that we have nothing to do. He was constantly at his father's office in room 201 Moore street, and took part in the business, at least to the extent of receipting for the money taken in, and of signing, if not dictating, some of the letters in Hedrick's name. He is also said to have overheard Maloney and McCluskey at work upon their "reloading" operations. We, of course, recognize that in such cases a man, especially a subordinate, may go along in ignorance of the purposes of his superiors. That may have been the case here; in such matters absolute certainty is impossible. But when we consider that he was Lewis Van Riper's son, and engaged daily in his office, it appears to us that the extent of his acquaintance with what went on must rest with the jury.

### Harry Hedrick.

This defendant especially insists upon the insufficiency of the evidence to charge him, chiefly based upon his supposed withdrawal from New York on August 10th. We cannot agree in the argument. Among them all he was the head and front; his name was used on all the circulars and correspondence, and more generally than that of any one else in oral communications with customers. It is incredible that this should have been done without his consent, even if Resnick is wrong in supposing that she heard Maloney and McCluskey use his name within his hearing in selling Parco stock. It is, indeed, true that he left New York before affairs were in extremis, but that by no means proves that he had cut his communications with the business. On the contrary, he stopped over at Wyoming for several days to examine the well, where he must have learned the facts.

It is argued that he could not be held criminally responsible for what took place in his absence, on the theory that a man may not commit crime through an agent. But we do not to-day distinguish between principals and accessories before the fact, the only distinction which was ever important in the subject. That crime may not be imputed to a principal through implied authority is not to the point. Hedrick left an organization in New York which he had created more than any one else; it used his name and would presumably keep on. He knew that it would sell stock, and he had been privy to its sales. Until he dissociated himself from his fellows, he remained in the scheme and in the conspiracy. If those who were left had diverged widely from the earlier common practices, a question might arise; but they did not. The conduct of the sales, at least through August, the jury might find to be part of a scheme to which Hedrick remained a party.

However, it is not necessary to depend upon his personal observations at Wyoming,

or what was done when he left, for it was clearly a question for the jury how far Sweet, on his return in June, told him the truth, especially about casing in a 50-barrel well, and how far Brown's wires throughout July served to open his eyes. It is hardly credible that these men were engaged in deceiving each other. The jury was to say how much he was informed of the facts, how far he believed that the stock had value, and whether while directly in charge he supposed that the scheme was honest.

Finally, there was no warrant whatever for saying that all the Parco shares were treasury stock, conceding that the 250,000 shares which Hedrick got for the well were such, though the asset had no market value at the time. The only other shares which could possibly be regarded as treasury stock were 750,000 issued to Hedrick on August 8th, for the leases at Nitro. At best only 40 per cent. of the capitalization of the company had ever become treasury shares, and only 10 per cent. when the prospectus was issued, which stated that all shares were such. The peculiarly indefensible sales to Tefft served to throw light upon Hedrick's honesty.

### Sweet and Ish.

Sweet was the company's president, and negotiated the contract with Kuykendall and the lease with Tingley. His defense is that he was not aware of what was being said in the circulars which went out from 15 Moore street. It was on his letter to Hedrick that the first circulars were issued, containing the false statement about casing in the 50-barrel well, and on his return he saw and talked with Hedrick. He was at times at the offices at 15 Moore street, and attended some meetings there. It is, of course, impossible to say that he must have known how the stock was being sold, nor is it necessary. A man who connects himself so closely with such an enterprise presumably has a live interest in it, which leads him to keep informed. His opportunities for information and his motive to get it justify a conclusion which he may be called upon to answer. In the end the question lies with a jury how far he has succeeded. In the case at bar his proved misstatements about the Wyoming well no doubt went far to overthrow his story, but in any case the issue is not for us.

Ish was the secretary and apparently had only a small part in the enterprise. As in the case of Van Riper, the younger, it would be reasonable to reduce his sentence. Yet there was again enough evidence to hold him.

He was at the office and addressed some of the mail to customers. One instance was proved against him of an interview with Peck, one of the customers. Peck complained of being tricked, and Ish professed to agree with his complaint. Later, however, Ish ratified the transaction by signing Peck's certificate. There was evidence also from which the jury could suppose that Ish had set on one of the salesmen to try to secure further money from Peck, which he had told Ish he would not use for new shares. This incident shows him in a relation to the stock selling which formed a basis, taken with the rest, on which a jury might depend. It took place at the very end of September, at a time when the whole enterprise was clearly doomed. Any shares sold could not have been innocent, unless the seller was altogether ignorant of the condition of the company.

### Ackerson.

This defendant had, so far as appears, nothing to do with the scheme until the end of October, though he had known the elder Van Riper and Maloney before. He told Maloney of Van Riper's proposed withdrawal, which was a surprise to Maloney, and offered him employment in the office which he proposed to set up. This he opened at 500 Fifth avenue about the middle of November, taking over, from the Moore street offices, Maloney, McCluskey, and Resnick, and employing in addition one Rabinowitz. The name he chose for the firm was James Loftus & Co., though it was disputed whether there ever was a Loftus. Ackerson himself adopted an alias, Martin Sands, and Maloney and McCluskey sold stocks; that being the business. Again, there is a dispute whether Parco shares were sold, but that we cannot settle. It is enough that there was testimony to that effect; testimony which, if we were called on to pass upon it, we should not hesitate to believe. Later the firm changed its name to Holton & Abbott, after Rabinowitz had left, and Brown, who had drifted back from Wyoming, had been taken on by Ackerson. H. P. Douglas & Co. and Craig, Matthews & Co. have a somewhat ghostly but unimportant relation to these firms, all of them apparently ephemeral creatures, well suited to the purposes of their creators.

This showing amply justified the jury in finding Ackerson guilty. As we have said of Maloney and McCluskey, any sales of Parco shares at that time, or effort to sell them, was the barest fraud. It is preposterous to argue that the jury had no right to say that Ackerson, who clothed himself dishonestly

and took over the ruins of a broken-down scheme, must have known what his subordinates were about. If he had an innocent explanation to make of what on its face was a common enough trap for the guileless, it rested with him to show it, and he did not. Men do not set up a business of such a kind under a false name, employing cheats as their active assistants, and keep aloof and ignorant of the means by which the profits are made.

However, Ackerson was not connected with any enterprises of Maloney and McCluskey after April 10, 1925. Rabinowitz, who testified for the prosecution, expressly says that he was not in the firms of J. A. Foster and E. Lenroot, and that J. A. Foster & Co. was formed on April 10, 1925, over three months after he had left Ackerson's employ because of some differences between them. It is true that Elkins once saw Ackerson at the office of Lenroot, but that does not warrant the inference that he was connected with it. Therefore we must conclude that the evidence does not implicate Ackerson in the scheme at the time when the letters laid in counts 7 and 9 were posted. The crime consists in the posting of the letter (U. S. v. Young, 232 U. S. 156, 161, 34 S. Ct. 303, 58 L. Ed. 548), and if the defendant was not in the scheme when the letters were posted he was not a principal or an accessory to the crime then committed. Thus it happens, apparently by mere chance, that the evidence will not support the conviction of Ackerson, except on the conspiracy count. On that it will, because it is enough that for five months he was attached to the scheme, even though during that time no one of the letters laid in the counts was mailed.

[5] Ackerson's motion to amend the return needs no more than an allusion. There is no reason to suppose that the newspapers which the jury saw affected their verdict; but, if so, it was a matter of discretion for the trial judge.

[6, 7] Error is assigned because of many of the rulings in the admission of evidence. The most important was the failure to limit the declarations of certain of the defendants to themselves and to those who were then in the conspiracy. Such declarations are admitted upon no doctrine of the law of evidence, but of the substantive law of crime. When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made "a partnership in crime." What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all. Hitchman C. & C. Co. v. Mitchell, 245 U. S. 229, 249, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461.; Conn. Mut. L. Ins. Co. v. Hillmon, 188 U. S. 208, 23 S. Ct. 294, 47 L. Ed. 446. For this reason, merely narrative declarations are not competent. But it is also a part of the law of joint crimes that, when a party joins an existing group already so engaged, he assumes responsibility for all that has been done theretofore. Anonymous, 6 Mod. 43; People v. Mather, 4 Wend. (N. Y.) 229, 258, 259, 260, 21 Am. Dec. 122; Comm. v. Rogers, 181 Mass. 184, 194, 63 N. E. 421; 1 Russell on Crimes (8th Ed.) 190; 1 Bishop, New Criminal Law, § 642. For this reason all that was done before he entered may be used against him, but obviously not what was done after he left, Logan v. U. S., 144 U. S. 263, 309, 12 S. Ct. 617, 36 L. Ed. 429; Brown v. U. S., 150 U. S. 93, 14 S. Ct. 37, 37 L. Ed. 1010.

[8, 9] It was therefore entirely proper to admit against him all that had been done before Ackerson came into the conspiracy, but it was strictly speaking improper to admit against those who had left in October what was done thereafter, and possibly as against Ackerson what Maloney and McCluskey did after he had left on April 10, 1925. All that it was, however, necessary to do as respects this proof, was to caution the jury that they were not to consider the evidence against those who had left the enterprise. The trial occupied seven weeks; the record consists of over 2600 typed pages of evidence, filled in large part with repeated objections to the admission of evidence, argued at length. The trial judge declined to make specific rulings upon the motions to strike out evidence, since they were of unimaginable prolixity, and would have served no conceivable purpose, but to confuse the jury. Very properly he left the matter to be dealt with in his colloquial charge. There he told them that, if they concluded that any defendant had actually and in good faith withdrawn from the conspiracy at any time, he was no longer responsible for the acts of those who remained, nor was he bound by their declarations, even though made in pursuance of the conspiracy; that it was a question of fact for them whether any given defendant had in fact so withdrawn. This told the jury the law quite as effectively as—indeed, more so than—formal rulings striking out the proof.

Indeed, in a case of this kind it is extremely doubtful whether such admonitions have any serious importance. We do, indeed, continue to give them, though the whole matter is highly technical, since in nine cases out of ten it is impossible for any one, lay or legal, to divide his mind into proof-tight compartments, and forget at one moment what he must use at another. Assuming, however, that the instruction was necessary, it would reduce the trial of a cause to the most sterile logomachy to insist on more than was done here. Perhaps chiefest of all the counts in the indictment against our criminal procedure is based upon the sophistries which have pervaded it in respect of rulings on evidence. Reversals for formal errors are a crying scandal, which has brought the whole system into disrepute.

[10] The only other question of evidence which seems to us important is the admission of telephone talks between customers of the defendants and persons at the other end of the wire, who represented themselves as speaking from the offices at 15 Moore street, or "uptown," and who generally gave the name, Hedrick, or that of some one in the employ of the defendants. Usually the witness professed to be able to recognize the voice of his interlocutor, though the evidence was often unsatisfactory; but there were some instances that can hardly rest upon that. In most cases it was the witness who was called on the telephone. We do not think that the competency of the testimony inevitably depended upon the witness' recognition of the voice. Other circumstances may be enough sufficiently to identify the speaker. If, for example, a man were to write a letter, properly addressed to another, and were to receive a telephone call in answer, professing to come from the addressee, and showing acquaintance with the contents of the letter, it would in our judgment be a good enough identification of the speaker to allow in the proof, though in the end, of course, the issue of identity would be for the jury. This is the reasoning on which a complete correspondence is admitted, once its origin is established, so long as it continues to be consecutive in substance. Wigmore, § 2153.

The decisions hold, though not with entire unanimity, that when a witness calls up at the proper number in a telephone book the person whose admissions are relevant, and gets an answer from one professing to be the person called, it is prima facie proof of identity; that is, that the proof is equal to an interview with some one found at the office of the party in question. Holzhauer v. Sheen, 127 Ky. 28, 104 S. W. 1034; Miller v. Leib, 109 Md. 414, 72 A. 466; Theisen v. Detroit, etc., Co., 200 Mich. 136, 166 N. W. 901, L. R. A. 1918D, 715; Union Construction Co. v. Western Union Tel. Co., 163 Cal. 298, 125 P. 242; Godair v. Ham. Nat. Bank, 225 Ill. 572, 80 N. E. 407, 116 Am. St. Rep. 172, 8 Ann. Cas. 447; Knickerbocker Ice Co. v. Gardiner, etc., Co., 107 Md. 556, 69 A. 405, 16 L. R. A. (N. S.) 746; Wigmore, § 2153. The case is not the same, to be sure, when the declarant calls up the witness, for the declaration of the speaker cannot establish his identity; but even then as we have suggested, the substance of the communication may itself be enough to make prima facie proof.

In the case at bar Parco stock was almost certainly not being sold by any one outside the offices at 15 Moore street, and later, except at the offices uptown. There is, of course, a theoretical possibility that others might sell it, but it was extremely remote. The kind of solicitation was the same as it was proved that Maloney and McCluskey and others in the office used to beguile customers. The calls were upon customers to whom sales had already been made by the defendants, presumably known only to them. The chance that these circumstances should unite in the case of some one who did not speak from the offices seems to us so improbable that the speaker was sufficiently identified. Of course, this did not identify him as the person whose name he gave; indeed, we may be substantially sure that ordinarily he was not that person. But the jury might conclude that he was either Maloney, or McCluskey, or some other salesman in the office, and the other proof was again enough to allow the jury to find that the defendants were privy to the way in which Parco stock was sold, and to the devices used, by their salesmen. Therefore, we think that the testimony was competent.

The judgment is affirmed as follows:

As to Hedrick, on counts 1, 3, 5, 6, and 10.

As to L. C. Van Riper, on counts 1, 2, 3, 4, 5, 6, and 10.

As to Sweet, on counts 1, 3, 5, 6, and 10.

As to Ish, on counts 1, 3, 5, 6, and 10.

As to C. E. Van Riper, on counts 1, 3, 5, 6, and 10.

As to Maloney and McCluskey, on all counts.

As to Ackerson, on count 10.

As to the other counts it is reversed.

Judge MANTON, through absence, has not read this opinion, but concurred in the result, except as to Hedrick, in respect of counts 1 and 6.