## SMITH et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 2, 1922. Rehearing Denied January 16, 1923.)

### No. 5569.

**1. Criminal law ⚌1129(6)—Objection that indictment does not state offense not reviewable under refusal to give peremptory charge.**

An objection that an indictment does not state an offense is not properly reviewable under a refusal to give a peremptory charge at the close of the evidence.

**2. Internal revenue ⚌2—Harrison Anti-Narcotic Act held valid as revenue measure.**

Though the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q) is a revenue measure, the requirements that druggists must not sell where they have knowledge that buyer is seeking a narcotic on a bogus prescription, and that physicians should bona fide prescribe in the course of professional treatment, to bring them within the statutory exemptions, are valid, as they are reasonable and germane to the revenue purpose.

⚌For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes
284 F.—43

3. **Conspiracy ⬥48—In prosecution for conspiracy to violate Anti-Narcotic Act, instruction held proper.**

   In prosecution for conspiring to violate Harrison Anti-Narcotic Act, § 2 (Comp. St. § 6287h), instructions as to the definition and description of the conspiracy charged *held* proper.

4. **Criminal law ⬥823(2)—Court's statement to jury held to cure any variance from proof in instruction.**

   Where, after an objection was made to an instruction commenting on the evidence, on the ground that there was no evidence to support it, the trial judge stated that he recalled that a witness so testified, but, if the jury's remembrance was otherwise, the jury may ignore this portion of the charge, *held* to cure any variance from the proof.

5. **Conspiracy ⬥47—Evidence held to show a "sale" within inhibition of Harrison Anti-Narcotic Act, though government agents intended to get their money back to use it as evidence.**

   In a prosecution for conspiracy to violate the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), evidence *held* to show a "sale" of narcotics, though the government agents, in arranging for defendants' exposure and capture, had determined to take the money back from defendants and use it as evidence against them.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

6. **Criminal law ⬥37—Fact that government agents' scheme resulted in entrapment of defendants held no defense.**

   In a prosecution under the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), the fact that a sale of narcotics was made pursuant to a plan of the government agents to entrap defendants *held* no defense.

7. **Criminal law ⬥761(14)—Contention that instructions assumed course of law violation by defendants held hypercritical.**

   In a prosecution for conspiring to violate the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), the contention that the court in its instructions assumed a course of law violation by defendants *held* hypercritical.

8. **Conspiracy ⬥45—Acts and declarations of alleged coconspirators held competent.**

   In a prosecution for conspiring to violate the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), acts and declarations of alleged coconspirators *held* competent to establish a conspiracy.

9. **Criminal law ⬥1168(2)—Admission of evidence out of order held not prejudicial.**

   In a prosecution for conspiring to violate the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), the admission of evidence out of order was not prejudicial to defendants.

10. **Criminal law ⬥1169(5)—Admission of evidence, which was later stricken out, held not error.**

    The admission of evidence, which was later stricken out, *held* not error.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

W. V. Smith and E. H. Myerly were convicted of conspiring to violate Harrison Anti-Narcotic Act, § 2, as amended, and they bring error. Affirmed.

J. M. Johnson, of Kansas City, Mo., for plaintiff in error Smith.

John H. Atwood, of Kansas City, Mo. (W. G. Lynch, of Kansas City, Mo., on the brief), for plaintiff in error Myerly.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Sam O. Hargus, Sp. Asst. U. S. Atty., of Kansas City, Mo. (James W. Sullinger, U. S. Atty., of King City, Mo., on the brief), for the United States.

Before CARLAND and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. Error by E. H. Myerly and W. V. Smith from conviction for conspiracy to violate section 2 of the Harrison Anti-Narcotic Law as amended (Comp. St. § 6287h).

[1] Error is claimed in refusal to give a peremptory charge at the close of all the evidence. It is claimed that such a charge should have been given for two reasons: First, that the indictment does not state a public offense; second, that the evidence was insufficient to sustain a conviction. The first reason is, in reality, an attack upon the indictment and is not properly reviewable under a refusal to give a peremptory charge at the close of the evidence. However, as the indictment was challenged and that challenge preserved in the assignment of errors, the point will be determined.

[2] The argument is that the Harrison Act (Comp. St. §§ 6287g–6287q) is a purely revenue measure; that, so treated, it does not forbid prescriptions for narcotics by physicians given with no intention of medical treatment but to satisfy drug cravings of addicts and does not forbid druggists from filling such prescriptions, with full knowledge of their character. The Harrison Act is a revenue measure. United States v. Jin Fuey Moy, 241 U. S. 394, 36 Sup. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854; United States v. Doremus, 249 U. S. 86, 39 Sup. Ct. 214, 63 L. Ed. 493. However, Congress had the power to enact all requirements in connection with that, or any other act, which it deems advisable, for the purpose of enforcing and making the law effective, and such power is limited only by the restriction that such requirement is reasonably related to its apparent purpose. Discussing the provisions of this act, in a somewhat similar case (Hughes v. United States, 253 Fed. 543, 544, 165 C. C. A. 213, 214) this court said:

"The effect of the provisions is to limit sales to registered dealers, save the excepted instances. One exception authorizes physicians and certain others to dispense the drugs in the course of 'professional practice only,' and the obtaining of them from a dealer upon a physician's prescription, both without the written order above referred to."

In the same case it was further said:

"But we think it cannot be said that the provisions referred to have no real or substantial relation to the raising of revenue. If they have such relation, we have nothing to do with any other purpose of Congress. The traffic in such drugs is of a peculiar character. Considerable of it is carried on covertly by peddlers, and the small bulk of the articles facilitates clandestine distribution. The difficulties of subjecting the traffic to excise and preventing frauds on the revenue are obvious, and it was competent for congress to bring the traffic into the open. That there may be consumers of the drugs, who cannot or will not obtain them in the ways provided, is not enough to condemn the statute. Substantially the same result might have followed a heavy tax on such transactions, as to which there would be no color for claim of unconstitutionality."

Considering the character of the traffic and the difficulty of enforcing this revenue act, we think the requirement that physicians should bona fide prescribe in the course of professional treatment in order to bring them within the exception in the statute is reasonable and germane to the revenue purpose. This is equally true of a sale by a druggist with knowledge that the purchaser is seeking the drug upon a bogus prescription. Rothman v. U. S. (C. C. A.) 270 Fed. 31, 33.

The second ground claimed to require a peremptory charge is the insufficiency of the evidence. The entire evidence has been carefully read and studied in the light of the specific reasons urged for its insufficiency. We think it ample to authorize submission to the jury.

[3] The charge given by the court is attacked in four particulars. One of these is that the court erred in its definition and description of the conspiracy charged. Regarding this claim of error it is urged that the jury was not bound to find or consider the particular conspiracy charged or events forming such alleged agreement; that the court did not identify or individuate the particular conspiracy charged; that neither the manner and means of effectuating the conspiracy nor the persons to whom the drugs were to be sold were specified; that there was no evidence of any conspiracy to dispense drugs illegitimately to persons, much less drug addicts—the only instance being of drugs dispensed to a government agent; that the charge permitted the jury to consider all the acts and declarations of the defendants, and those with whom they dealt as proof of the conspiracy, when it should have charged that the conspiracy must be proven independent of such acts and statements; that facts not proven are assumed; that overt acts were permitted to be considered in proof of the conspiracy. This portion of the charge is as follows:

"If, however, the two combine and confederate together and have an understanding between themselves, using their positions as physician and druggist illegitimately to bring it about that these drugs are dispensed, not for the purpose which the law contemplates, but, in general, to dispense and distribute them to the general public, not in the exercise of the practice of a profession, regularly, not in the exercise of a distribution by a druggist generally, upon a bona fide prescription, that would be a means and an opportunity and an avenue for the evasion of the law, and the question comes up, then, in a case of this kind, 'What are the facts?' Have the parties acted within their rights, and legitimately, or have they so combined and confederated together, and done other things which are essential to the existence of a conspiracy, whereby their acts have been illegitimate?

"Now, gentlemen, we come down to what conspiracy is. A conspiracy is an understanding or agreement between two or more persons to do an unlawful thing, or to do a lawful thing by unlawful means. In this case—in the case before you—it comes under the federal statute, which provides that it shall be unlawful for two or more persons to combine, confederate, or agree together to commit an offense against the United States. Well, it is an offense against the United States to dispense or to dispose of any of these drugs otherwise than in accordance with the law, so if two persons in this case, as charged, conspire, confederate, and agree together, to commit that offense, that is a conspiracy within the purview of this statute under which this indictment is brought."

"Now, gentlemen, there is nothing mysterious about the nature of conspiracy. We say it is a conspiracy, a confederation, an agreement, an understanding. It does not require any written document to set it in motion. It does not require any formal action on the part of the parties to set it in motion. It is

sufficient if, in a given case, as charged, there is a common understanding, tacit or otherwise, so that the parties understand each other—just understand each other that they are going to do the forbidden thing, and that one or both of them is to do some act, or the acts which are essential, to bring it to a successful conclusion. Now that is all there is to a conspiracy, and that is all that you are called upon to find here as to whether there was any such thing in the nature of a conspiracy, as has been defined, existing between these two defendants at the time charged."

"Now, gentlemen, the question is, Did they conspire, confederate and agree together, as it is charged, to sell, barter, distribute, and dispense these drugs to persons who had no right to receive them? That is the question.

"Now what does the government rely upon to establish this conspiracy? It has introduced the evidence here before you. The court has exercised its discretion and its proper function in restricting that evidence to proper evidence that may be considered by the jury in arriving at a verdict in this particular.

"It is in testimony here, on the part of the government, that one of the government agents, Toomey, together with another man by the name of Thompson, now dead, who cannot be here before you, as was stated by the witness Toomey, through some arrangement made, by Thompson, with the defendant Smith, went to the office of defendant Smith on the 25th day of April, to get some prescriptions. It is stated here that there were to be 100 of them. When they got there, Smith stated he only had 35 of them done; that in the meantime some other persons came in and asked for prescriptions for drugs, and, without stopping to write some individual, specific prescription for such person, some of these that had already been prepared were taken off and handed to such persons, and then their place was supplied by writing further prescriptions until 100 were written.

"That then the defendant Smith was asked, in order to make this more certain that these drugs would be received, because it is known that all parties engaged in the sale of drugs are mindful of the Narcotic Law, and if any one is engaged in the sale of drugs illicitly, he is, of course, apprehensive of the federal agents, and, in order to make sure there would be a delivery of these drugs, so the witness Toomey states, they asked the defendant Smith to call up the druggist, defendant Myerly, and advise him that a man by the name of Williams, from Omaha, was coming over there right away with these prescriptions, so that he would know who the party was when he arrived, and so that that might operate in the nature of an introduction; that Smith did go to the telephone, called up Myerly—of course, there is no evidence here who was on the other end of the telephone, or what he said, but that was the action of Smith, testified to by Toomey; called up Myerly and advised him that this man Williams was coming over, and to give him 25 of each.

"Of course the court, you understand, gentlemen, is not undertaking to state verbatim what was said, because you heard the evidence, and you remember it. This is only to call your attention to the facts that the government has produced here, from which it expects to prove that conspiracy existed. That Smith did this, and then handed them the prescriptions that have been shown to you; that they were written indiscriminately, and Toomey says that he sat there with a directory—telephone directory—before him, picking out names haphazard to insert in the prescriptions to give them an appearance, as he stated, of bona fide prescriptions for some specific person. Then the witness Toomey further asked defendant Smith if he would not give him some little note to the druggist that would operate as a further assurance of his being waited on, and he put on that as you will remember—something about Mr. Williams from Omaha; something of that kind, whatever it was, gentlemen of the jury; you remember what that was. Now, then, they departed immediately, and also, he states that the doctor advised this man Thompson, in order to avoid getting caught, to put the prescriptions in his stocking, or in his shoe, going over there, which was done.

"They then proceeded to the drug store of the defendant Myerly, and there, you will recall what conversation passed between the defendant Myerly and the government agent Toomey, in company with the deceased man, Thompson.

Toomey went in and asked him if he had received a telephone message from Dr. Smith, and he said he had; but he said, 'I am engaged with a salesman here; wait until I get through, just a few minutes, and I will wait on you.' As soon as the salesman departed, the defendant Myerly beckoned to the government agent to come back behind the prescription case. He went back there, and Myerly was asked if he had received the telephone message from Dr. Smith, and he said he had, and he handed him then this note, which Myerly took, read, and placed in his vest pocket. Then Myerly wanted to know what he wanted, and Toomey restated what he wanted and handed him these prescriptions. Witness Toomey states that, without reading them, he took them and tossed them back behind some bottles on the case—some bottles standing behind the prescription case there. There was then conversation as to what it was going to cost, and Myerly said it would be $5 per bottle, for 50 items, and put down on a slip of paper, 'Five dollars, fifty, two hundred fifty dollars.'

"Now there, gentlemen, is the evidence substantially as to the conspiracy part of it, independently of any overt act charged, from which you are called upon to determine whether there was, in your opinion, an understanding and agreement between these parties whereby, upon prescriptions issued in that manner by this defendant Smith, the defendant Myerly was to deal out, dispense, sell, and distribute these forbidden drugs? Of course, gentlemen, if this testimony is true, it would seem to be beyond question that the prescriptions were not issued in accordance with the regular practice of the defendant Smith as a physician. In fact, that is practically admitted here in the argument of his counsel, when he says that was a violation of the spirit of this act.

"Of course, further, the dispensation in that manner by the defendant Myerly of the large quantities of drugs you see here, to an individual upon prescriptions received in that manner, would not be in accordance with the usual dealings of a druggist in dispensing drugs of this highly powerful character, in accordance with the provisions of this act.

"Now then, from what was said and done by these two persons so closely in conjunction and sequence, on the same day there, and only a few minutes, or an hour, or half hour apart, the readiness, or lack of readiness, as you judge from the testimony, with which the defendant Myerly acted upon the situation as presented to him there, in view of the telephone message, and the manner in which these prescriptions were presented, you are to decide whether you believe there was an understanding and agreement there, amounting to a conspiracy under the law, as I have defined it, between these two defendants, for the unlawful dispensing of these drugs not in accordance with the practice of a physician, nor in accordance with the dispensation by a druggist in conformity with the terms of this act. That is the matter for you to decide."

At the instance of the defendants the court charged as follows:

"The court instructs the jury that the government must establish the conspiracy as substantially charged in the indictment beyond a reasonable doubt, independent and apart from the overt acts charged in said indictment, or any other acts or declarations which the government claims were done in furtherance of said alleged conspiracy. And unless said conspiracy so charged is so established independent and apart from such overt acts or declarations, then the jury must find the defendants not guilty."

We think this part of the charge is not open to any of the objections urged.

[4] Another objection to the charge is that there was no evidence to sustain the part following:

"Now then, they departed immediately, and also, he states that the doctor advised this man Thompson, in order to avoid getting caught, to put the prescriptions in his stocking, or in his shoe, going over there, which was done."

When this portion was objected to by counsel for the defendants, the court said:  ·

"The Court: Well, gentlemen, the court recalls that Mr. Toomey did say that, but if you recall it differently, you may ignore that. If Mr. Toomey did not state that, then the court's memory was at fault. All this is left to the memory of the jury."

This statement cured any variance from the proof.

[5] A third criticism of the charge is that the transaction between the druggist and the government agent was not a "sale" because the agents intended to get back the money, which belonged to the government, and use it as evidence. This portion of the instruction is as follows:

"Now, if you find there was this overt act committed, having first found, if you do find it, that this understanding and agreement existed, then that completes the offense. Now the evidence on that point is that after the negotiations had proceeded up to the point that I have just narrated, the witness Toomey handed to the defendant Myerly $250. He took the $250, and subsequently delivered to Toomey the morphine and cocaine in question, at his garage.

"Now, gentlemen, if that was done, if you find that was done, that constituted a sale.

"It is immaterial that the government agents in arranging this attempted exposure and capture had determined that they would take this money from either the defendant Smith or the defendant Myerly and hold it here as evidence to be produced before the court, of the money that was paid over there. That does not detract from the relationship of bargain and sale there that existed under the circumstances that I have stated. If that money was handed to Myerly in return for goods, and Myerly delivered the goods in exchange for the money then and there, there was a sale, under the law, and this money now, though held here and brought here into this court as evidence in this case, just as any other incriminating evidence would be taken from any man charged with a crime, is not the money of the government, and is not the money of Toomey. It remains the money of Myerly, and the $75 remains the money of Smith, held here only as evidence in this case, which does not detract from the relationship of vendor and vendee, nor from the elements of bargain and sale, constituting a sale of that property."

The facts showed a sale and the charge is not open to this assault.

[6, 7] The final attack upon the charge is as to that portion covering entrapment. It is said that the charge assumes previous engagement in violations of the Harrison Act although there was no evidence thereof; and also that what the government agents did was purely entrapment. That portion of the charge is:

"Now then, it is stated here that this sale is vitiated by the fact that a plan was formed here by these government agents to detect this crime, to detect these parties as engaged, as they claim, in this sort of business, on the ground that they enticed the parties into committing the very crime with which they are now charged. Gentlemen of the jury, that is not the law.

"It is entirely proper, and it is within the strict right of the law officers of the government, in their administration of a law of this nature, and their guarding it from violation, to take any steps of the character that have been described here, for the purpose of determining whether certain parties are engaged in the violation of the law.

"We all know that crime is committed, if it is committed, in secrecy. We know that parties who would ordinarily buy this drug, for the purpose of satisfying their own diseased cravings, would be the last in the world to advise the government of the fact, and to put the government in the way of de-

priving them of the source of their supply by bringing those engaged in the illicit practice to justice.

"It is essential, not only under this law, but under any number of laws with which you are familiar, that the agents of the government, or the agents of the state, as the case may be, should form plans whereby they may determine whether parties are thus violating the law, and bring them to justice.

"It is no enticement to ask a physician to write an illegal prescription, if you suspect that he might do it, and you want to find out if he does it, nor to ask a druggist to sell narcotics illicitly, because both of them know better, and if they are going to obey the law, why they won't do that in response to any form of petition or inducement, and it is perfectly within the rights of investigating officers to determine, by means that have been here disclosed, whether a party, or parties, are engaged in violation of the law, and, if they are, to take steps accordingly, so that I wish to disabuse your minds of all this confusion that this, in itself, was such an unwarrantable offense on the part of the federal officers that it relieves this offense charged, if you find any offense was committed, of its character as such offense."

This statement of the law, as here applicable, is correct. Rothman v. U. S. (C. C. A.) 270 Fed. 31, 35. The claim that the court assumed a course of law violation by defendants is rather hypercritical.

[8, 9] Several errors are claimed in connection with admission of evidence. The first is as to conversations and acts at the time the prescriptions were obtained by the agents from Smith when Myerly was absent. Another is the statements and acts of the agent and Myerly at the time the drugs were purchased and delivered in the absence of Smith. A conspiracy must usually be established by evidence of different actions by the separate conspirators showing knowledge of and execution of the conspiracy. Here it was entirely proper to show what either Smith or Myerly did in connection with the transaction for the purpose of establishing a conspiracy. These acts fitted together perfectly and formed a. mosaic which showed the conspiracy in outline and detail. The large number of such prescriptions given by Smith and filled by Myerly; the acquaintance between them; the unhesitating action of Smith in giving Toomey a large number of prescriptions and of Myerly in filling them without even looking at them; the telephone conversation; the anxiety of the druggist for the purchaser's safety and the method of delivery at the garage—all show clearly and beyond question a concerted plan of action. These were enough of themselves to prove the conspiracy and that it was in existence and operation before Toomey went to Smith's office for the prescriptions. In this state of proof, the conversations and statements objected to were competent. Conn. Mutual Life Ins. Co. v. Hillmon, 188 U. S. 208, 218, 23 Sup. Ct. 294, 47 L. Ed. 446. The fact that the statements were admitted out of order could not prejudice defendants.

[10] The final objection is to the admission of evidence by Toomey that, while he was in the office of Smith, Smith would give addicts, who came in, prescriptions from the pile he was making out for Toomey; and evidence by one Ruth that in December, 1918, he procured prescriptions from Smith and had certain conversations with Smith about where to have them filled. The evidence of Toomey and of Ruth to which objection is made was stricken out later.

We note no error for which these convictions should be reversed; therefore, the judgment will be and is affirmed.