# UNITED STATES v. LINDENFELD.

## No. 414.

Circuit Court of Appeals, Second Circuit.

June 1, 1944.

830

Peter J. Haberkorn, of New York City, for defendant-appellant.

Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y. (Harold M. Kennedy, U. S. Atty., and James G. Scileppi, Asst. U. S. Atty., both of Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Defendant appeals here from his conviction and sentence to imprisonment, after trial by jury below, on fifteen counts of violating section 2554(a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 2554(a), which makes it unlawful for any person to sell or give away opium, coca leaves, or any compound, salt, derivative, or preparation thereof, except in pursuance of a written order on a form issued for that purpose by the Secretary of the Treasury. Defendant is a physician who practiced medicine in Germany for many years beginning in 1921, but, losing his license because of the racial restrictions later enforced there, emigrated to this country in May, 1939, and received his license to practice in the State of New York in April, 1941. The unlawful acts of which he was charged and found guilty were the issuance of prescriptions of morphine sulphate, a derivative and preparation of opium, to drug addicts, who applied to him as "patients" for "treatment." It was the government's contention at the trial that by such actions defendant removed himself from the protection of § 2554(c) (1) of the statute, which excepts from the general mandate of § 2554(a) the distribution of drugs "by a physician * * * in the course of his professional practice only."

Attention of the United States Narcotics Squad was first called to defendant sometime in 1942. During the period from August to November of that year agents of the squad made several trips, with drug addicts who had previously acted as informers, to the vicinity of defendant's office in Queens. The agents thoroughly searched the addicts, gave them marked money, and instructed them to go into defendant's office complaining of some illness and ask for drugs. Each time the addicts came out with prescriptions for varying amounts of morphine sulphate and without the marked money. Once an agent himself went in to see defendant, but was unable to dupe him and hence was sent away empty-handed. At the trial it was shown that when an addict came in, defendant would briefly ask what was wrong, make a most cursory and unprofessional examination (such as poking once the abdomen of a patient complaining of stomach ulcers to see if there was any pain), and then prescribe morphine sulphate as a virtual panacea for all ills. Finally, on November 10, 1942, three agents went to defendant's neighborhood with two addict-informers, and followed the usual procedure in sending the latter in to defendant's office. When the addicts emerged without the marked money, but with prescriptions, the agents themselves went to the house, rang the doorbell, and, when defendant answered it, immediately placed him under arrest, although they had no warrant.

After thus taking him into custody, the agents went with defendant across his entrance hall into his office, where, upon request, he produced from his desk drawer the marked bills which he had received from the informers. They then asked him where he kept his records, as required by 26 U.S.C.A. Int.Rev.Code, § 2554(c) (1), showing the patients to whom he had prescribed drugs; and he removed a drawer of cards from a filing cabinet and commenced to look through them. Becoming impatient of the time thus consumed, the agents asked defendant if they could see the cards. As to what transpired thereafter, there was a sharp conflict of testimony at the trial, the three agents testifying that defendant handed the cards over and consented to their inspection, defendant claiming that they were taken over his strenuous objection. But, in any event, the cards were eventually impounded by the agents and never returned to defendant. They revealed that defendant had written over 600 prescriptions for morphine sulphate between June, 1942, and the date of arrest for between 105 and 110 patients; and when agents later tried to check up on the patients listed, they found that the greater number of the names and addresses were false. At the trial, the cards were one of the cornerstones of the government's case; and through the information

supplied by them the government was able to secure several additional witnesses, beyond the informers, to testify against defendant. Defendant made the usual motion before trial to suppress the cards as evidence, but it never came up for argument; and when counsel for defendant brought the matter to the court's attention during trial, the latter stated that they had been taken with consent and also as an incident to a lawful arrest.

■ Defendant argues, first, that his acts were merely those of a physician in the course of professional employment, and hence within the exception of § 2554(c) (1). But that was a question of fact as to defendant's good faith for the jury to decide, and it was properly presented to them in the court's charge. When a licensed physician abuses his professional function by selling or giving away prescriptions for drugs to known addicts, he automatically forfeits the privileges extended to him by § 2554(c) (1) of the statute. United States v. Behrman, 258 U.S. 280, 287, 42 S.Ct. 303, 66 L.Ed. 619; Jin Fuey Moy v. United States, 254 U.S. 189, 192, 41 S.Ct. 98, 65 L.Ed. 214; Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497; Nigro v. United States, 8 Cir., 117 F.2d 624, 631, 133 A.L.R. 1128, and cases cited therein; Hawkins v. United States, 5 Cir., 90 F.2d 551, certiorari denied 302 U.S. 733, 58 S.Ct. 118, 82 L.Ed. 566; Manning v. United States, 8 Cir., 31 F.2d 911; Grigg v. Bolton, 9 Cir., 53 F.2d 158, certiorari denied 285 U.S. 538, 52 S.Ct. 311, 86 L.Ed. 931; Bush v. United States, 5 Cir., 16 F.2d 709. Nor was there any entrapment—as defendant next contends—so as to entitle defendant to a verdict of not guilty. Entrapment exists only when the government agents induce and originate the criminal intent of a defendant; there is none where the criminal intent is already present, and the agents merely afford the opportunity for the commission of a crime. Sorrells v. United States, 287 U.S. 435, 441, 442, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249; Grimm v. United States, 156 U.S. 604, 609, 610, 15 S.Ct. 470, 39 L.Ed. 550; Smith v. United States, 8 Cir., 284 F. 673, 679, 680, certiorari denied 261 U.S. 617, 43 S.Ct. 362, 67 L.Ed. 829; United States v. Becker, 2 Cir., 62 F.2d 1007, 1008; United States v. Pappagoda, D.C.Conn., 288 F. 214, 217, and cases cited therein; Lucadamo v. United States, 2 Cir., 280 F. 653; Nutter v. United States, 4 Cir., 289 F. 484; Simmons v. United States, 6 Cir., 300 F. 321; Weiderman v. United States, 8 Cir., 10 F.2d 745; Fiunkin v. United States, 9 Cir., 265 F. 1; United States v. Ginsburg, 7 Cir., 96 F.2d 882, certiorari denied 305 U.S. 620, 59 S.Ct. 81, 83 L.Ed. 396; Ratigan v. United States, 9 Cir., 88 F.2d 919, certiorari denied 301 U.S. 705, 57 S.Ct. 938, 81 L.Ed. 1359, rehearing denied 302 U.S. 774, 58 S.Ct. 52, 82 L.Ed. 600. As the court here charged the jury to this effect, their verdict negatives the existence of the defense.

■ The essential question that remains before us, then, is whether the cards which constituted such damaging evidence against defendant at the trial were taken from his office as the result of an illegal search and seizure within the prohibition of the Fourth Amendment. If they were, then they should have been excluded as evidence under the mandate of the Fifth Amendment. Agnello v. United States, 269 U.S. 20, 34, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409, and cases cited therein. We have noted that the trial judge proceeded on the alternate grounds that defendant gave his consent not merely to the inspection, but also to the taking, of the cards, and that they were taken as an incident to a lawful arrest; but, as we are of the opinion that the cards were properly received on the latter ground, it is unnecessary to consider the conflicting testimony as to consent.

■■ Initially, there can be no doubt that defendant was lawfully arrested, even though the agents possessed no warrant. The law is clear that any person, law enforcement officer or private citizen, can make an arrest where a felony has in fact been committed, and the person making the arrest has probable cause for so believing. United States v. Gowen, 2 Cir., 40 F.2d 593, reversed on other grounds in Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Brady v. United States, 6 Cir., 300 F. 540, certiorari denied 266 U.S. 620, 45 S.Ct. 99, 69 L.Ed. 472; Pritchett v. Sullivan, 8 Cir., 182 F. 480; cf. also 5 U.S.C.A. § 300a, codifying the common law with regard to arrests by agents of the Federal Bureau of Investigation, and A. L. I. Code of Criminal Procedure, 1930, § 21, and commentary, pp. 231–238. And the agents here certainly had more than probable cause for believ-

ing that defendant had just committed a felony.[1]

■ Conceding the lawfulness of the arrest, therefore, the crucial issue arises as to whether the agents could legally have sought and seized the cards as an incident thereto. The mass of seemingly conflicting decisions on the point, which can serve only as a general guide, since each case must be decided on its own facts, Go-Bart Importing Co. v. United States, supra, 282 U.S. at page 357, 51 S.Ct. at page 158, 75 L.Ed. 374, and through which, as we said in Matthews v. Correa, 2 Cir., 135 F.2d 534, 536, we must proceed "gingerly" and "with due circumspection, so far as lies in our power, for the constitutional rights of the petitioner and the need that government officials be not unduly hampered in tracking down crime," have evolved certain general principles. Surely when there is a lawful arrest, the premises may be searched; the cases are not in accord merely as to how broad an area the search can cover and as to what can be the objects of the search. The better view as to area is that the search can cover that part of the premises over which the offender's control and unlawful activities likely extended, Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Sayers v. United States, 9 Cir., 2 F.2d 146, 147; United States v. Wilson, C.C.S.D.N.Y., 163 F. 338; or, as it was phrased in Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231, the search can include "all parts of the premises used for the unlawful purpose." A refinement of this doctrine is that the objects sought must be in the "immediate possession and control" of the accused. Marron v. United States, supra, 275 U.S. at page 199, 48 S.Ct. at page 77, 72 L.Ed. 231; Go-Bart Importing Co. v. United States, supra; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775. Within this area, there is agreement that fair game for the searchers consists of "things used to carry on the criminal enterprise," Marron v. United States, supra, 275 U.S. at

page 199, 48 S.Ct. at page 77, 72 L.Ed. 231, or the fruits of the crime and the means by which it was committed. Ibid.; see also Agnello v. United States, supra, 269 U.S. at page 30, 46 S.Ct. at page 5, 70 L.Ed. 145, 51 A.L.R. 409; Carroll v. United States, supra, 267 U.S. at page 158, 45 S.Ct. at page 287, 69 L.Ed. 543, 39 A.L.R. 790; Weeks v. United States, supra, 232 U.S. at page 392, 34 S.Ct. at page 344, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177; United States v. Kirschenblatt, 2 Cir., 16 F.2d 202, 51 A.L.R. 416; Cheng Wai v. United States, 2 Cir., 125 F.2d 915. The necessity of drawing a fine line of distinction only arises again in borderline cases as to whether an object is one with which the crime was committed or whether it is merely evidence of the crime, and hence not a proper object of search. See Matthews v. Correa, supra, 135 F.2d at page 537; United States v. Kirschenblatt, supra.

■ Applying these criteria to the present situation, the search can hardly be condemned for covering too broad an area. The controversial cards were within reach of defendant's desk in the office, which was the essential part of the premises that was being "used for the unlawful purpose." Being so situated, they were clearly in the "immediate possession and control" of defendant. Marron v. United States, supra; Go-Bart Importing Co. v. United States, supra; United States v. Lefkowitz, supra. Moreover, the cards were more than mere evidence of the crime. They were the means through which defendant hoped to cover up his illegal acts, and thus were a vital factor in the criminal enterprise itself. Hence the cards here were at least as much, and probably much more, a part of the crime as were the ledgers, and especially the bills, in Marron v. United States, supra.

In every case of this kind, however, the usefulness of analogies drawn from other cases is limited. See Matthews v. Correa, supra. There is always the ultimate question whether the search seems basically reasonable; it is an undercurrent which is felt through all of the decisions, and where a decision against admissibility is made, the facts usually show a search that went

---

[1] Though we find it unnecessary so to decide, it seems probable that the arrest was lawful also because the crime (which involved for its ultimate consummation the filling of the prescriptions by some drug-gist) appears to have been committed "in the presence of" the officers. Shettel v. United States, 72 App.D.C. 250, 113 F. 2d 34; State v. Lutz, 85 W.Va. 330, 344, 101 S.E. 434; A.L.I. loc cit. supra.

beyond one made in good faith for the fruits or means of the particular crime. As was stated in the Go-Bart case, supra, 282 U.S. at page 357, 51 S.Ct. at page 158, 75 L.Ed. 374, "There is no formula for the determination of reasonableness." Here, we are not prepared to say on the facts before us that the search was basically unreasonable. There was no exhaustive and minute combing of the premises as in the Go-Bart and Lefkowitz cases, supra, relied upon so heavily by defendant. Instead, it was the natural and logical thing for the agents to ask for defendant's records of patients, which we have seen he was required by law to keep and which were bound to be nearby. And the search went no farther than that, although a thorough ransacking of the house quite possibly might have turned up additional damaging evidence. In the light of such considerations, we feel that the cards were properly taken as an incident of defendant's lawful arrest.

Affirmed.