**UNITED STATES of America, Appellant,**

v.

**Manfred SWAROVSKI, Appellee.**

**No. 908, Docket 76–1556.**

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1977.

Decided May 31, 1977.

Edward R. Korman, Chief Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Richard W. Brewster, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., on the brief), for appellant.

Richard H. Kuh, New York City (Kuh, Shapiro, Goldman, Cooperman & Levitt, P. C., and Andrew R. Cooper, New York City, on the brief), for appellee.

Before MEDINA, ANDERSON and TIMBERS, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

On October 28, 1975, Manfred Swarovski was indicted for attempting to export, without a license from the State Department, a military camera known as the KB25A, designed to be used as a gunsight camera in the F–4 fighter plane, in violation of the Munitions Control Act, 22 U.S.C. § 1934(c), as implemented by Executive Order 10973, Part I, § 101, 22 C.F.R. §§ 121.01, 123.01, 127.01, and for conspiring to do so. Swarovski was arrested by United States Customs Agents at JFK International Airport on April 2, 1975, as he was waiting to board a flight to Germany. In response to inquiries by the agents, he told them that he was not exporting any item that required a State Department license. The agents, however, had discovered the KB25A camera in baggage Swarovski had checked with the airline and had seized it together with some documents that were also found in his bags. Thereafter while he was in custody he was advised of his *Miranda* rights and in response to questioning by the agents made several more statements. Prior to trial, Swarovski moved to suppress the camera, the documents found in his bags, and all post-arrest statements. On Novem-

ber 5, 1976 the district court granted the motion to suppress the statements and the Government now appeals pursuant to 18 U.S.C. § 3731.

Photo-Sonics, Inc., a California firm, manufactures the KB25A camera. Two Canadian firms, Canosphere Industries, Ltd., and Swarolite of Canada, Ltd., ordered from Photo-Sonics four cameras of various types, including the KB25A. When informed that a State Department license was required for exportation of the KB25A camera, R. N. Parker of Swarolite of Canada completed the forms necessary to secure a license and gave the final destination of the camera as Austria. The State Department, however, refused to issue a license because the intended ultimate use for the camera was not specified. Parker then asked Photo-Sonics whether an export license was required in order to ship the camera to a consignee in the United States. Upon learning that no license would be necessary for such a shipment, a new purchasing order was filed requesting that the camera be shipped to Swarolite, Inc., in Columbia, Tennessee. Photo-Sonics suspected that the camera was still destined for Austria and notified Customs Agent VanPatten in California, who instituted an investigation.

With the cooperation of the manufacturer and the United States Postal Service, Customs Agents were present on March 29, 1975 when the KB25A camera arrived at a post office box in the name of Swarolite, Inc., in Columbia Tennessee. One James Sproul picked up the package and was observed by the Customs Agents when he delivered it to Manfred Swarovski, a citizen of Austria, at a motel in Columbia. The Agents thereafter kept Swarovski under surveillance, and followed him when he left for New York via Chicago. The constant surveillance over his activities was continued during Swarovski's stay at the Waldorf-Astoria Hotel, to which he had been driven by an agent, posing as a taxi driver.

Swarovski had made reservations on a Lufthansa flight to Munich, Germany, leaving from JFK Airport on April 2nd. When he failed to check in for the Munich flight, the agents who were continuing the surveillance and investigation at the Airport, checked at other airlines and discovered that Swarovski had checked in on an overseas flight with Pan American Airlines. Thereupon several agents converged on the Pan Am passenger area where Swarovski was seen waiting to pass through the security area. While other agents followed Swarovski to the boarding area, Customs Agent Fish went to locate Swarovski's luggage, which he found among the baggage being assembled for the Pan Am flight. He immediately opened one bag and found the camera. He then closed the bag and took Swarovski's luggage to the Pan Am boarding area. Meanwhile, Customs Agents Rennish and Grattan approached Swarovski, identified themselves as Customs Agents, and asked to speak with him in private. The Agents and Swarovski moved into the corridor where defendant handed them his passport. Agent Rennish asked him whether he had purchased anything with a value in excess of $250 while he was in the country, whether he had any items requiring a shipper's export declaration, and whether he had any articles necessitating a State Department license for export. Swarovski answered "no" to each question. After the agents asked for and received his airline ticket, he was accompanied to another lounge where the luggage, which he identified as his, had been placed on a table. One of the bags opened by the Agent disclosed the camera. When Swarovski admitted that he did not have an export license, he was formally placed under arrest, read his *Miranda* rights, and, because he is an Austrian citizen, given a card with the warnings printed in German. Further questioning took place at the Customs Office after his arrest and in the courthouse prior to arraignment. Both the arrest and the search of Swarovski's luggage were made exclusively by Customs Agents without warrants.

The Government argues that under the regulations promulgated by the State De-

partment,[1] district directors of customs have been authorized under 22 C.F.R. 127.05(a) to "take appropriate action" to prevent the illegal exportation of items on the munitions list, and that customs agents are, therefore, empowered to make warrantless arrests when they have probable cause to believe an individual is attempting to export arms in violation of the Munitions Control Act.

Section 127.05(a), however, does not constitute specific statutory authority to make warrantless arrests and such power "is not a natural incident derived from the catalogue of [an agent's] duties but must be separately granted by the act of a sovereign." *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967). The only specific and express federal statutory authorization for customs agents to make warrantless arrests is in 26 U.S.C. § 7607 and concerns violations of federal laws relating to narcotics and marihuana. Therefore, "the law of the state where an arrest without warrant takes place determines its validity" and thus "the New York statute provides the *standard* by which this arrest must stand or fall." *United States v. DiRe*, 332 U.S. 581, 589, 591, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948) (emphasis supplied. *See also, United States v. Watson*, 423 U.S. 411, 420–21 n. 8, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Rosse*, 418 F.2d 38, 39 (2d Cir. 1969), *cert. denied*, 397 U.S. 998, 90 S.Ct. 1143, 25 L.Ed.2d 408 (1970); *United States v. Heliczer, supra*, 373 F.2d at 244–45.

The district court held, ". . . that the arrest of Swarovski by customs agents at J.F.K. Airport on April 3, 1975 was illegal because the agents lacked any authority to make the arrest." It cited *United States v. Watson, supra*, 423 U.S. at 420–21, 96 S.Ct. 820, for the general proposition that in the absence of specific federal statutory authority for customs agents to make warrantless arrests for offenses other than those enumerated in 26 U.S.C. § 7607, authority must be found in the law of the state where an arrest without a warrant takes place, to be valid. The district court concluded that the State of New York has no such law, that the arrest of the defendant Swarovski was unlawful, and that all post-arrest statements by him to the agents must be suppressed as fruits of an illegal arrest.[2] It also concluded that the decisions by this court in *United States v. Burgos*, 269 F.2d 763 (2d Cir. 1959), *cert. denied*, 362 U.S. 942, 80 S.Ct. 808, 4 L.Ed.2d 771 (1960); *United States v. Viale*, 312 F.2d 595 (2d Cir.), *cert. denied*, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); *United States v. Heliczer, supra*, and *United States v. Rosse, supra*, which held that federal officials who had no federal arrest authority, could, as private citizens, arrest in the State of New York a person who has in fact committed a felony, were erroneously decided because the panels deciding them "do not seem to have focused closely upon New York statutes which carefully define and limit a citizen's power of arrest." The district judge said, ". . . the New York Penal Law simply does not include federal crimes within its carefully framed definitions of 'felony' and 'offense'." The

---

1. The Munitions Control Act authorizes the President to promulgate regulations defining the articles to be controlled by the licensing procedures of the Act and provides for a criminal penalty for any person who willfully violates the Act or any rule or regulation issued under it. 22 U.S.C. § 1934. The President has delegated his authority to control the exportation of arms to the Secretary of State. Executive Orders Nos. 10973 and 11432. Under the regulations promulgated by the State Department, "aerial cameras" and "special purpose military cameras" are on the list of articles requiring a State Department license for exportation. 22 C.F.R. § 121.01.

2. The district court also ordered, for reasons independent of the validity of the arrest, that any information, other than personal history data, obtained from the defendant as a result of questioning him at the courthouse on April 3, 1975, in the absence of counsel, be suppressed. The district court found this information was improperly obtained because prior to the questioning, Swarovski's attorney had advised the agents that there was to be no further interrogation of his client. No appeal is taken from this ruling.

Government, on the other hand, cites the same decisions of this court as governing authorities for upholding the validity of the arrest.

This is the principal issue in the present case, and it has arisen in part because of amendments made during this century to the body of New York law known as the Penal Code. In its 1909 version it defined a "crime" as "an act or omission forbidden by law, and punishable upon conviction" by death, imprisonment, fine, removal from office, disqualification to hold any office of trust, honor or profit under the state; or other penal discipline. It subdivided or classified a crime as either "a felony" or "a misdemeanor." A felony was described as "a crime which is or may be punishable by: 1. Death; or, 2. Imprisonment in a state prison."

The Penal Code had been adopted in 1881; and, contemporaneously with it, there was enacted the Code of Criminal Procedure (Criminal Code), which, among other provisions, included § 183 which authorized a private person to arrest another person "[f]or a crime, committed or attempted in his presence; [or] . . . [w]hen the person arrested has committed a felony, although not in his presence."

The Criminal Code used the word "crime" but not the word "offense." It remained in effect until September 1, 1967, when it was amended by substituting the words "an offense" for the words "a crime." On September 1, 1971, the Code of Criminal Procedure was replaced by the Criminal Procedure Law which became effective on that date, and § 183 was superseded by § 140.30 of the Criminal Procedure Law. It reads as follows:

"1. Subject to the provisions of subdivision two, any person may arrest another person (a) for a felony when the latter has in fact committed such felony, and (b) for any offense when the latter has in fact committed such offense in his presence.

2. Such an arrest, if for a felony, may be made anywhere in the state. If the arrest is for an offense other than a felony, it may be made only in the county in which such offense was committed."

The Practice Commentary on page 534 of Book 11A entitled, "Criminal Law" in McKinney's Consolidated Laws of New York, says of these sections,

"Subdivision 1 substantially restates the former law (CCP § 183) concerning the circumstances under which a private person—meaning *any* person—may make an arrest. In short, he may arrest for an offense only when the defendant has in fact committed it (reasonable cause to believe the same not being sufficient), and for an offense of less than felony grade only when the defendant has in fact committed the offense in his presence.

Subdivision two, designating the places or counties in which such arrests may be made, is new, since the Code does not cover that subject."

Meanwhile, however, as of September 1, 1967, the Penal Code was amended to use the word "offense" as a generic term meaning "conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state or by any law, local law or ordinance of a political subdivision of this state, or by any order, rule or regulation of any governmental instrumentality authorized by law to adopt the same." Penal Law, Book 39, Section 10.00(1) (McKinney's). Felony is defined in Section 10.00(5) as "an offense for which a sentence to a term of imprisonment in excess of one year may be imposed." "Crime" is defined in Section 10.00(6) as "a misdemeanor or a felony." Section 1.20 of the Criminal Procedure Law incorporates by reference the definitions of the Penal Law.

From 1881 to September 1, 1971, the Code of Criminal Procedure in § 183 (which, in effect, codified the common law [3]) authorized arrests without warrants by any person in the State of New York of anyone who

---

**3.** *United States v. Gowen*, 40 F.2d 593 (2d Cir. 1930), *reversed on other grounds, sub nom.*

*Gobart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

was committing or who had just committed a felony. This power was exercised in the State by "universal practice," whether the criminal action was a felony under the laws of New York or under the laws of the United States. *United States v. Lindenfeld*, 142 F.2d 829 (2d Cir. 1944) (Circuit Judges Swan, A. Hand, and Clark, writer of the opinion); *Marsh v. United States*, 29 F.2d 172 (2d Cir. 1928) (opinion by L. Hand with Swan and A. Hand, *Circuit Judges*).

In *Marsh*, Judge L. Hand said, among other things:

"The only thing left is whether the trooper had authority by virtue of the state law to arrest the defendant for a federal misdemeanor, of whose commission in his presence he had lawfully obtained the evidence. Section 177 of the New York Code of Criminal Procedure provides that 'a peace officer may, without a warrant, arrest a person, * * * for a crime, committed or attempted in his presence,' thus including all misdemeanors, whether or not they be breaches of the peace. Whether the power so conferred includes federal crimes has never, so far as we can find, been directly ruled by the state courts. On the other hand, it has been a universal practice of police officers in New York to arrest for federal crimes, regardless of whether they are felonies or misdemeanors, and to bring the offenders before a commissioner. The distinction between the two classes is irrelevant, unless we assume that there is a common law of federal criminal procedure, fixed as of 1789. At any rate, no such distinction has been made, and the practice is strong evidence of the understanding of the state officials as to the meaning of the state law." 29 F.2d 172, at 173.

In *Lindenfeld*, Judge Clark said:

"Initially, there can be no doubt that defendant was lawfully arrested, even though the agents possessed no warrant. The law is clear that *any person*, law enforcement officer or private citizen, can make an arrest where a felony has in fact been committed, and the person

making the arrest has probable cause for so believing. *United States v. Gowen*, 2 Cir., 40 F.2d 593, reversed on other grounds in *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; *Brady v. United States*, 6 Cir., 300 F. 540, certiorari denied 266 U.S. 620, 45 S.Ct. 99, 69 L.Ed. 472; *Pritchett v. Sullivan*, 8 Cir., 182 F. 480; cf. also 5 U.S.C.A. § 300a, codifying the common law with regard to arrests by agents of the Federal Bureau of Investigation, and A.L.I. Code of Criminal Procedure, 1930, § 21, and commentary, pp. 231–238. And the agents here certainly had more than probable cause for believing that defendant had just committed a felony." 142 F.2d 829, at 831–2. (Footnote omitted.) (This case concerned an arrest and prosecution for illicit sales of morphine, but took place long before the enactment of 26 U.S.C. § 7607 on July 18, 1956.)

Of the remaining Second Circuit cases cited by the Government, *Burgos, Viale* and *Heliczer* were all decided before the amendment of September 1, 1967 to the Code of Criminal Procedure when the words "an offense" were substituted for the existing words "a crime", and before the Penal Code was amended on the same day to redefine some of its general terms. The case of *United States v. Rosse, supra*, was decided in 1969 after those amendments, but before the supplanting of § 183 of the Code of Criminal Procedure by § 140.30 of the Criminal Procedure Law. The Practice Commentary concerning this change is quoted *ante*; as to arrest by a private person of one who has committed a felony, it says that § 140.30 substantially restated CCP § 183. Nothing is said about a termination of the authority to make such arrests, as well as arrests by peace officers, in cases of federal felonies.

In the *Rosse* case this court said,

"New York's definition of a felony governs here. The new definition of a felony in the recently enacted Penal Code includes federal crimes punishable by over

one year's imprisonment. N.Y.Penal Law McKinney's Consol.Laws, c. 40, § 10.00(5) (1967)." 418 F.2d 39, n. 1. As to this point we turn briefly to a case tried in New York courts which clearly recognized that an arrest for a federal felony, made by a peace officer or by a private person in the State of New York is valid. The case of *People v. Floyd*, 56 Misc.2d 373, 288 N.Y.S.2d 950 (Sup.Ct., Queens Co., 1968), concerns the arrest by a New York City Police Officer of the accused Floyd who was wanted by the federal court on its outstanding federal court bench warrant for a federal charge of forgery. The City police officer did not have the warrant and had only heard about it from a United States Postal Inspector. The Supreme Court of New York recognized two questions in the case: one was the validity of the arrest by the City police officer for a federal offense. The arrest was initially made on the federal charge. The second question concerned the facts that the officer, and two uniformed City police with a passkey furnished by the hotel clerk, entered Floyd's room without notice of their authority and purpose and there discovered Floyd with some narcotics in his possession. The police seized the narcotics and handcuffed Floyd. The issue arose as to the lawfulness of entering the hotel room in the manner described. The trial court, with respect to the first question said,

". . . [A]n arrest, *without a warrant, may properly be made by any person whether he be a law enforcement officer or private citizen, where a Federal felony has in fact been committed.*" (Emphasis in original.) 288 N.Y.S.2d 950 at 954.

The court cited *Lindenfeld, supra,* and *Burgos, supra.* As to the second question the trial court held that the means used to enter the room with the passkey required the announcement of authority and purpose which was not done. It ruled, however, that the police were faced with exigent circumstances which made their action lawful. The prosecution had proceeded in the state courts on the state charge of possession of narcotics and Floyd was convicted.

The Appellate Division, 33 A.D.2d 795, 307 N.Y.S.2d 832 (2d Dept. 1969) (two justices dissenting), affirmed on both points. The strong dissent, however, though it accepted the circumstance of the arrest of Floyd by a City policeman in New York for a federal felony without any suggestion of its impropriety, did declare that it was error for the trial court to find exigent circumstances so that the non-compliance by the police with the requirement for an announcement of authority and purpose before entering the hotel room called for a reversal of the conviction.

On appeal to the New York State Court of Appeals, 26 N.Y.2d 558, 312 N.Y.S.2d 193, 260 N.E.2d 815 (1970), the judgment of conviction was reversed because the police in breaking and entering the hotel room failed to give the statutorily required notice "to the occupants of who they [were] and the purpose for which they [sought] entry." 26 N.Y.2d at 561, 312 N.Y.S.2d 193 at 194, 260 N.E.2d 815, at 816. The court was well aware that police of the City of New York acted to arrest Floyd because he was wanted for forgery on a federal warrant. Judge (now Chief Judge) Breitel said for the court,

"Because the police, otherwise authorized to make a lawful arrest, effected the arrest by unlawful means, the evidence obtained as a result of the arrest may not be used and defendant's conviction must be reversed and the indictment dismissed."

It should be particularly noted that the New York State Court of Appeals' opinion expressly said, concerning this arrest by a state peace officer of a person who was committing a federal felony, ". . . *the police, otherwise authorized to make a lawful arrest,* . . ." (emphasis supplied) and that this was subsequent to the enactment of New York Penal Law § 10.00(1) (September 1, 1967) defining "offense" as conduct measured by the penalty prescribed by the law of this state (New York).

■ In sum, the great weight of opinion in the federal courts and in the courts of

the State of New York, as well as the understanding and practices of the executive branches of the federal and state governments is to the effect that the statutory provisions of the State of New York which authorize arrests by private persons of another person who is in the act of committing or has in fact just committed a felony in the State of New York, include felonies under the laws of the United States as well as those under the laws of New York.

Section 140.30 of the Criminal Procedure Law of the State of New York, in force on April 2, 1975, when United States Customs Agents arrested the defendant below at Kennedy Airport in New York, gave authority to private persons to arrest for a felony. It so happened that the felony in this case had been committed in the very presence of the agents. There was no issue of probable cause. As heretofore noted, the New York definition of a felony contained in the Penal Law § 10.00(5) is "an offense for which a sentence to a term of imprisonment in excess of one year may be imposed," and this definition is incorporated into the Criminal Procedure Law by reference. (It is also helpful at this point to compare the federal definition of a felony as provided in the United States Code:

"Any offense punishable by death or imprisonment for a term exceeding one year is a felony." 18 U.S.C. § 1.)

■ Had the Criminal Procedure Law and the Penal Law contained nothing more than those provisions above mentioned, the district court would have presumably felt free to hold that the intent of the New York Legislature in enacting those laws was consistent with the interpretation given to them in the light of their historical context which is that the old § 183 and the new § 140.30 authorized private person or citizen arrests for felonies committed under federal law as well as under New York state law. The Penal Law, § 10.00(1), separately defines an "offense" as "conduct for which a sentence to a term of imprisonment or to a fine is provided by any law *of this state* or any law, local law or ordinance of a

political subdivision *of this state*, or by any order, rule, or regulation of any governmental instrumentality authorized by law to adopt the same." (Emphasis supplied.) This definition persuaded the district court that it was the intention of the legislature to confine the authority granted in § 140.30 to make private person arrests for felonies only to those felonies provided for under New York state law and to exclude from the exercise of such authority, felonies under federal law. We disagree.

We are entirely unpersuaded that the Legislature of the State of New York, in recodifying the criminal procedure law and the penal law of the State, either intended to or did in fact, dissolve all participation by the executive and judicial branches of the State government in dealing with federal criminal offenses, occurring within the boundaries of the State, to the extent and degree that it has developed for nearly 100 years in the interpretation and application of the 1881 Criminal Code and has become the established practice recognized by the executive and judicial branches of the State and Federal Governments. This is particularly true with respect to arrests by New York peace officers and by private citizens, of persons who are committing or who have committed federal felonies in the State of New York. There is not a scrap of legislative history to show that the termination of such participation was ever contemplated. There is nothing in the Practice Commentary concerning § 140.30 of the Criminal Procedure Law to the effect that arrests could no longer be made by private persons in the State of New York of someone committing or who had just committed, a federal felony. There is nothing in the commentary covering § 10.00 of the Penal Law which states or suggests that the purpose of the definitions was in whole or in part to bring to an end the State's participation in the apprehension and delivery of federal offenders to the appropriate federal authorities. The New York State Legislature could, of course, have codified the interpretation of existing statutes to include the right to arrest federal felons, but this was hardly necessary in the light of 200 years of

a well developed custom and a pattern of state participation and cooperation in arresting, and placing in federal custody, violators of federal criminal law in the State—a practice which is now so vital and important in any high crime area of the nation.

If the district court's chain of reasoning, which would thus remove from the State's consideration and authority, an offense, which is a federal felony or misdemeanor, is followed, it would apparently likewise render nugatory 18 U.S.C. § 3041,[4] which grants powers in the apprehension and holding of those charged with federal crimes, to certain executive and judicial officers of the states. This statute is almost an exact copy of its ancestor, in direct line of continuous descent, from the first such statute, "The Act of Sept. 24, 1789" (Ch. 20 § 33, 1 Stat. 91), which over the span of the lives of the federal government and of the State of New York has been an important and useful factor in fostering New York's (and other States') participation in the administration and enforcement of the federal criminal laws. This cooperative state action is ancillary and essential to § 3041, which cannot very well function without it.

It may be argued that it is only in instances where the State of New York has a criminal statute, covering an offense which is substantially identical with a federal offense which a prisoner, arrested by a New York peace officer or a private person, has committed, that such peace officer or a private person, has the right to arrest a federal offender in the State of New York. Presumably the arresting party could turn the offender over to federal authority to be prosecuted in the federal court on the federal charge, or he could turn the offender over to the state to be prosecuted on the state charge. In either case, the arresting party had authority to arrest assuming the offense was a felony, as in the present case.

The United States Supreme Court, however, has ruled that, while one must look to state law to find the authority for a state peace officer or a private person to arrest someone who has committed a federal felony in the State of New York, this does not mean that such authority can only be invoked where the federal felony is exactly reflected in an identical state criminal statute; rather, it is only necessary that the federal crime be of the same standard or class of offense, here, for example a felony and that the state procedure authorize arrests for felonies by peace officers of the state or by private persons making a "citizen's arrest." The possible penalty for violation of the Munitions Control Act is two years of imprisonment, so that it fits both the New York state and federal definitions of felony.

■ The leading Supreme Court cases on this subject are, in chronological order, *United States v. DiRe, supra,* and *United States v. Watson, supra.* It should first be noted that *DiRe* was a case in which the suspect was arrested by a New York state officer for a *federal* crime. The Government had argued that the "validity of an arrest without a warrant for a federal crime is a matter of federal law . . . ." The Court ruled, however, "that in absence of an applicable federal statute the law of the state where an arrest without warrant

---

4. Section 3041 provides:
   "For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested and imprisoned or released as provided in chapter 207 of this title, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. Copies of the process shall be returned as speedily as may be into the office of the clerk of such court, together with the recognizances of the witnesses for their appearances to testify in the case.
   A United States judge or magistrate shall proceed under this section according to rules promulgated by the Supreme Court of the United States. Any state judge or magistrate acting hereunder may proceed according to the usual mode of procedure of his state but his acts and orders shall have no effect beyond determining to hold the prisoner for trial or to discharge him from arrest."

takes place determines its validity." 332 U.S. at 589, 68 S.Ct. at 226. It went on to say:

"By one of the earliest acts of Congress, the principle of which is still retained, the arrest by judicial process for a federal offense must be 'agreeably to the usual mode of process against offenders in such state.' [Footnote omitted; see footnote 4, *ante*, for Title 18 U.S.C. § 3041, present version of "Act of September 24, 1789."] There is no reason to believe that state law is not an equally appropriate *standard* by which to test arrests without warrant, except in those cases where Congress has enacted a federal rule." 332 U.S. at 589–90, 68 S.Ct. at 226. (Emphasis added.)

Congress has not done so and the New York state standard applies. The Supreme Court in effect ruled that, once the New York state standard had been complied with, the arrest by a state officer (or by a private person) without a warrant for a federal felony committed in that State was entirely lawful. We wholly reject the district court's holding in the present case that the new definition of the word "offense" in the 1967 revision of the Penal Law entirely revoked the power of New York police or peace officers and private persons to make arrests for federal felonies committed in the State of New York.

■ Although the original Act of September 24, 1789, above cited, was entitled "concerning arrest with warrant" and, although many of the arrests made pursuant to it would call for a warrant, there was no such requirement in the case before us. The felonious acts were performed in the sight and presence of the citizen or private person who made the arrest. Probable cause, therefore, is implicit in the circumstances and is not an issue. On these facts the arresting agent, as a private person, had the authority, pursuant to and within the standard adopted and used by the State of New York, to arrest the offender without a warrant, *United States v. Watson, supra*, 423 U.S. at 414–424, 96 S.Ct. 820.

■ Although Title 18 U.S.C. § 3731, which authorizes the Government to appeal from the granting by the district court of a motion to suppress, makes no provision for a cross-appeal by the accused, he may assert grounds for affirming the order of suppression. *Dandridge v. Williams*, 397 U.S. 471, 475–76 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *United States v. Finn*, 502 F.2d 938, 940 (7th Cir. 1974); *United States v. Moody*, 485 F.2d 531, 534 (3rd Cir. 1973). Included in the motion to suppress was the petition to have excluded from the real evidence the camera and documents seized from Swarovski's bags, and also his post-arrest statements which he claims were procured in violation of his *Miranda* rights. He also argued that the search and seizure of his bags violated his Fourth Amendment rights as did his arrest, because made without a warrant. The defendant's arguments before this court concerning the legality of the search of his luggage at the airport are not independent grounds supporting the district court's suppression of the post-arrest statements and therefore cannot be raised on the Government's § 3731 appeal. The other arguments by the defendant asserted in support of the suppression order have no merit and require no further comment.

The order of the district court on the principal motion to suppress, based upon the illegality of the arrest from which the Government has appealed, is reversed and set aside.

It is so ordered.